IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SAMSUNG ELECTRONICS CO., LTD.,    )
                                   )
              Counterclaim-Plaintiff,   )
                                   )    C.A. _____
        v.                   )
                                   )    **DEMAND FOR JURY TRIAL**
NETLIST, INC.,                  )
                                 )    **REDACTED - PUBLIC VERSION**
             Counterclaim-Defendant.   )

**SAMSUNG ELECTRONICS CO., LTD.'S COUNTERCLAIMS FOR VIOLATIONS
OF SECTION 2 OF THE SHERMAN ACT, BREACH OF CONTRACT, AND
UNFAIR COMPETITION; DECLARATORY JUDGMENT OF
<u>UNENFORCEABILITY OF EXCLUSION ORDER</u>**

Pursuant to 19 U.S.C. § 1337(c) and 19 C.F.R. § 210.14(e), Counterclaim Plaintiff Samsung Electronics Co., Ltd. ("Samsung") brings these counterclaims for monetary, injunctive, and other equitable relief against Counterclaim Defendant Netlist, Inc. ("Netlist"), arising from Netlist's (1) unlawful scheme to acquire and exploit monopoly power in violation of Section 2 of the Sherman Act, (2) attempt to acquire and exploit monopoly power in violation of Section 2 of the Sherman Act, (3) breaches of Netlist's contractual obligations to offer Samsung a license to Netlist's allegedly essential patents on reasonable and non-discriminatory terms and conditions and to negotiate such a license in good faith, and (4) acts of unfair competition in violation of California Business and Professions Code § 17200 *et seq.* Samsung also seeks a declaratory judgment that Netlist is prohibited from seeking or enforcing any exclusion order issued by the International Trade Commission ("ITC").

Netlist has illegally exploited the standard-setting process for memory technology. Standard setting organizations ("SSOs") are comprised of industry manufacturers that openly

propose various technologies that the industry must implement. Netlist has never made a technology contribution to the standards it now accuses of infringing its patents. Instead, Netlist secretly attempted to patent the ideas that *others* introduced for adoption at the SSO or that were otherwise publicly known. Netlist violated its obligations to SSO members by not disclosing its patents until *after* the industry adopted the standardized technology. Once the industry implemented the standards, Netlist launched world-wide litigation asserting patents it knew were invalid against Samsung (and the industry) and demanded anti-competitive licensing terms. Over zealous, Netlist now pursues ITC injunctive relief to further its anti-competitive aim after two trials in the Eastern District of Texas.

## NATURE OF THE ACTION

1.      This action concerns computer memory technology. All types of computing devices, from mobile devices to the cutting-edge servers found in data centers, require random-access (or non-volatile) memory that stores data for rapid retrieval and use by the device. Samsung is a leading developer and manufacturer of these types of memory module products.

2.      The memory products made by Samsung and its competitors embody various technologies. Memory technology is in a constant state of advancement, as the ever-increasing demands of computing devices require the development of faster, more efficient, and otherwise improved memory products.

3.      An organization of industry participants, the Joint Electron Device Engineering Council (also known as "JEDEC"), develops specifications, or "standards," for computer memory products and related peripherals. Standardization allows products from one manufacturer to interoperate with products from another manufacturer. Samsung has long served

as an active member of JEDEC, including by participating in the development of JEDEC standards.

4.      JEDEC standards confer market power on owners of patents needed to comply with the standard—i.e., standard-essential patents ("SEPs").  Because manufacturers' memory modules must comply with the JEDEC standards, alternative technologies are not commercially viable.  SEP owners can therefore demand licenses to their SEPs in order for memory module manufacturers to make JEDEC-compliant products.

5.      For this reason, JEDEC requires its members to make certain binding commitments to JEDEC relating to members' conduct at JEDEC and the patents those members own.  First, JEDEC members must disclose any patents or patent applications potentially covering technology used in draft standards that are under consideration.  Such disclosures allow JEDEC to make an informed decision about whether to adopt, as part of a standard, a technology that may be subject to a member's patent rights.  Second, when JEDEC adopts a standard that includes a JEDEC member's patented technology, that member is obligated to license its SEPs on reasonable and non-discriminatory ("RAND") terms.  This commitment plays a critical role in the standard-setting process, as it ensures that a patent owner cannot hold up the industry, or individual companies, by refusing to license an SEP or by demanding royalties for an SEP that exceed the value of the patented technology or that unfairly discriminate between industry participants.  Such conduct improperly exploits the patent owner's monopoly power over standardized technology.

6.      Netlist is a member of JEDEC.  But Netlist has not made any meaningful contribution to the standards for those products it now accuses of infringement.  In fact, Netlist does not make random-access memory products like those made by Samsung and its competitors. Instead, having failed to compete fairly in the computer memory market, Netlist has sought to

weaponize its patent portfolio, which Netlist alleged includes SEPs that give it monopoly power in the market for standardized memory module technology. Netlist's abusive patent practices—which include attempting to patent technology disclosed by others at JEDEC, deceiving JEDEC regarding its RAND commitments, demanding supra-RAND and discriminatory royalties, and, most recently, requesting that the ITC enjoin Samsung and certain of its affiliates and customers from importing standard-compliant memory modules based on Netlist's assertion of alleged SEPs—are part of a scheme to extract unjustified royalty payments from Samsung.

7.      This scheme began many years ago. As a member of JEDEC, Netlist could, and did, participate in JEDEC meetings. But Netlist did not participate for the purpose of contributing to the memory technology under consideration. Instead, Netlist used its JEDEC membership to copy ideas presented by other JEDEC members and file patent applications on the technology being considered for adoption by the industry. Netlist then failed to disclose potential SEPs to JEDEC until the industry had already adopted the technology that Netlist's patents allegedly cover.

8.      In addition to deriving its alleged inventions from other JEDEC members, Netlist never intended to license any SEPs on RAND terms, as JEDEC requires. In fact, Netlist expressly *refused* to do so on multiple occasions, leading to its expulsion from JEDEC in one instance and its withdrawal from JEDEC in another instance years later. Each time, Netlist eventually returned to JEDEC, offering false assurances that it would comply with its RAND license obligations—assurances Netlist made only to ensure it could regain admission to JEDEC meetings and thereby resume its practice of seeking to patent technologies under consideration by JEDEC.

9.    After the industry was locked into the technologies incorporated into the relevant JEDEC standards, Netlist exploited its monopoly power by refusing to license its patents that allegedly cover the relevant market without industry members paying exorbitant, supra-RAND royalties for Netlist's patent portfolio, thereby manipulating the technology and downstream markets and increasing prices.  Netlist has sought to execute this hold-up strategy through an industry-wide and overzealous litigation campaign in which Netlist's patents have been repeatedly found invalid—findings that confirm the unreasonableness of Netlist's license demands.  In response to the invalidation of its patents, Netlist has doubled down by obtaining, and then asserting, additional patents that do not meaningfully differ from the invalidated patents and that Netlist knows are invalid.

10.    Netlist effort to seek supra-RAND royalties are extraordinary.  Samsung and Netlist entered into a patent cross-license agreement in 2015.  Netlist later attempted to terminate Samsung's license in order to extract additional royalties to which Netlist is not entitled.  Following the purported termination—which Samsung maintains was improper and is the subject of a pending litigation for which Netlist incurred no legally cognizable damages, Netlist began threatening to assert, and later asserting, alleged SEPs against Samsung.

11.    Netlist did not make any license offer before embarking on this campaign against Samsung, nor has Netlist made any RAND offer or engaged in good-faith negotiations since then.  Indeed, Netlist has demanded that Samsung pay a royalty that amounts to ██████ ██ the amount Netlist accepted from another memory module manufacturer after protracted litigation.  After years of litigation, in which memory module manufacturers have invalidated the claims asserted against them in *more than a dozen* Netlist patents, Netlist recently initiated an action at the ITC in which Netlist seeks to bar Samsung products from the United States market.

Although Netlist asserts alleged SEPs in that action, Netlist has not made a RAND offer, in violation of its RAND commitment to all JEDEC members.

12.    Through this and other conduct described in more detail below, Netlist has violated and/or attempted to violate Section 2 of the Sherman Act, breached its contractual obligations owed to Samsung, and engaged in unfair competition in violation of California Business and Professions Code § 17200 *et seq*.

## THE PARTIES

13.    Samsung Electronics Co., Ltd. is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129, Samsung-ro, Yeongtong-gu, Suwon-si, Gyeonggi-do, 443-742, Republic of Korea.

14.    On information and belief, Netlist, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 175 Technology Drive, Suite 150, Irvine, California 92618.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over the claims for violations of the Sherman Act under 28 U.S.C. § 1331 and 19 U.S.C. § 1337(c).[1]

16.    This Court has subject matter jurisdiction over Samsung's claims for unfair competition and breach of contract under 28 U.S.C. § 1332(a)(2) and 19 U.S.C. § 1337(c), because Netlist, a Delaware corporation, and Samsung, a foreign corporation, are diverse parties, and the

---

[1]    Pursuant to 19 U.S.C. § 1337(c), Samsung's counterclaims were filed in the ITC in response to Netlist's complaint. *Certain Dynamic Random Access Memory (DRAM) Devices, Products Containing the Same, and Components Thereof*, Inv. No. 337-TA-1472 (I.T.C. Sept. 30, 2025).  Samsung removed its counterclaims to this Court pursuant to 19 U.S.C. § 1337(c) and 28 U.S.C. § 1446(e).

amount in controversy exceeds $75,000. This Court also has subject matter jurisdiction over the unfair competition and breach of contract claims under 28 U.S.C. § 1367 and 19 U.S.C. § 1337(c), because they form part of the same case or controversy as the claims for violations of the Sherman Act that Samsung asserts in this action.

17.    This Court has subject matter jurisdiction over the declaratory judgment claim pursuant to 28 U.S.C. §§ 2201, 2202, 1331, 1332, and/or 1367. Netlist, a member of JEDEC, has filed a complaint with the ITC that seeks an exclusion order based on patents that Netlist has alleged are essential to practicing certain JEDEC standards. A definite and concrete dispute therefore exists between Samsung and Netlist regarding whether Netlist's RAND commitment to implementers of JEDEC standards bars Netlist from seeking and enforcing injunctive relief against Samsung based on Samsung's manufacture, importation, and sale of JEDEC-compliant products.

18.    This Court has personal jurisdiction over Netlist, a corporation organized and existing under the laws of the State of Delaware.

19.    Venue is proper in this District under 28 U.S.C. § 1391(b)–(c) because Netlist is subject to personal jurisdiction in this District. In addition, this action arises, in part, out of Netlist's bad-faith assertion of patents in this District.

## FACTUAL BACKGROUND

### I.    Computer Memory Technology

20.    Samsung designs, manufactures, and supplies semiconductor products. Semiconductor products are an essential component of electronic devices, enabling advances in artificial intelligence, communications, computing, healthcare, military systems, transportation, clean energy, and countless other applications. Semiconductors can also be referred to as integrated circuits or microchips.

21.     Memory devices are a type of semiconductor used to store data.  Random-access memory ("RAM") is a type of memory that provides fast, short-term storage for data and programs the computer's central processing unit.  A specific type of RAM, which is relevant to the products and technologies in this case, is dynamic random access memory ("DRAM").  DRAM was invented in 1968 and marketed by Intel in the 1970s.  Compared to other types of memory, DRAM provides some notable advantages, including offering faster speeds, requiring less physical space to store the same amount of data, being cheaper to make, and consuming less power.

22.     DRAM technology has experienced consistent development since its introduction to the market.  For example, in the 1990s, Synchronous Dynamic Random Access Memory ("SDRAM"), a type of DRAM, was introduced.  The products and technologies at issue, including dual in-line memory modules ("DIMM") and high-bandwidth memory ("HBM"), include SDRAMs as components.

23.     Single Data Rate SDRAM, was the first generation of SDRAM commonly used in systems prior to 2000.  Double Data Rate SDRAM ("DDR") was the next generation, which, compared to the Single Data Rate memory modules, supported higher speed data-transfer rates.  Indeed, DDR almost doubled the data transmission frequency.

24.     There have been several generations of DDR, including Double Data Rate 2 SDRAM ("DDR2") in 2003, Double Data Rate 3 SDRAM ("DDR3") in 2007, Double Data Rate 4 SDRAM ("DDR4") in 2014, and the most recent generation of SDRAM technology, Double Data Rate 5 SDRAM ("DDR5"), in 2021.  Each successive generation has improved performance of the memory.

25.     In Netlist's litigation against Samsung and its competitors, Netlist has accused two types of memory modules of infringement: HBM and DIMMs, including load-

reduced DIMMs ("LRDIMM"), registered DIMMs ("RDIMM"), and multiplexed rank DIMMs ("MRDIMM"). DIMM is a type of computer memory that plugs into the motherboard to provide RAM. HBM is another type of computer memory used in high-performance computing applications that stacks SDRAM dies on top of each other. Both DIMMs and HBM contain SDRAM, with HBM including stacks of multiple SDRAMs.

26.    Both DIMMs and HBM include components used for signal routing between the CPU and SDRAM. As described below, Netlist's patents do not purport to teach the design or manufacture of DRAM or SDRAM—the fundamental component that stores data. Netlist has never designed such a component. Netlist's patents instead relate to signal routing within the module.

27.    Samsung has consistently been a successful innovator in the semiconductor and, more specifically, DRAM-manufacturing industry (including DIMMs and HBM). Over the period from 2016 to 2022, Samsung spent approximately $119 billion on research and development efforts. Samsung spent nearly $20 billion and over $24 billion on research and development efforts in 2023 and 2024, respectively. While these amounts are not specific to DRAM or memory products, the research and development expenses are evidence of Samsung's commitment to its own commercial success, the commercial success of its products, and remaining at the forefront of the technology industry.

28.    In the early 1990s, there were more than a dozen DRAM manufacturers around the world. That number has gradually declined. At present, there are essentially three major manufacturers in operation: Samsung, SK hynix, and Micron.

29.    Together, according to 2025 third-party market reports, these three manufacturers make up roughly 93% of the global DRAM market. For instance, with respect to

global DRAM market share, Counterpoint Research indicates that in Q2 of 2025, Samsung held 32%, SK hynix held 38%, and Micron held 23%. The reported DRAM market shares include both DIMM and HBM products.

30.     The semiconductor industry has long been thought of as high risk due to its cyclical nature. During global economic high-growth times, the demand for DRAM products has outpaced supply. At other times, however, supply has outpaced demand, leading to a supply glut of DRAM products. Such periods of oversupply occur in part because there is fierce competition among the chip manufacturing companies and because semiconductors generally cost less to produce as volume increases. When the three largest manufacturers—Samsung, SK hynix, and Micron—scale up production to increase market share, it can result in repeated price reductions in final consumer prices, particularly in times of lower demand.

31.     On account of these factors, particularly the fierce competition among manufacturers, market share is highly dependent on price.

## II.    JEDEC's Computer Memory Standards

32.     JEDEC is an independent, non-profit semiconductor engineering trade association and standardization body based in the United States. JEDEC has become the global leader in developing open standards and publications for a broad range of semiconductor technologies, including memory products. As relevant here, JEDEC develops standards for semiconductor memory chips and modules, including standards implemented by Samsung products. Over 300 companies in the computer and electronics industries are members of JEDEC, including Samsung and Netlist.

33.     JEDEC standards enable interoperability, i.e., the ability of memory products made by different manufacturers to work together with computer and electronic devices made by others. JEDEC standards are widely implemented, and, for many types of semiconductor

memory products, including DRAM modules (which are component parts incorporated into larger systems), it is imperative that those products comply with JEDEC standards in order to be commercially viable.

34.    Member companies participate in JEDEC's standard-setting process through over 50 committees and subcommittees that address various technological areas.  Through a collaborative process, members contribute to the standard by presenting to subcommittees the technologies that the contributing member believes should be incorporated into a particular JEDEC standard.  Committee members later vote on technical proposals for incorporation into the JEDEC standard.  Upon committee and board approval, new standards are promulgated.

35.    Once JEDEC selects a particular technology for the standard, the industry is effectively "locked in" on that technology regardless of the short- or long-term merits of the technology, and standard implementers are limited in their ability to innovate or use alternative technologies.   In other words, industry participants who have invested significant resources developing products and technologies that conform to the standard will find it prohibitively expensive to abandon their investment and switch to another technology.  Even were those industry participants to switch technologies, those alternative technologies would not comply with the standard and would therefore not be commercially viable because customers want memory products that are interchangeable with other modules and function within an integrated computer system. The standard therefore erects a substantial barrier to innovation in alternative technologies or the use of any technology that does not comply with the standard.

36.    JEDEC chooses technology winners and losers.  It often specifies which of multiple, competing technologies manufacturers must use, and therefore the standard eliminates alternative technologies.  Further, once a standard is adopted, future innovation on that generation

of standardized technology is discouraged.  This is because only the technologies incorporated into a particular standard, which ensure products from one manufacturer interoperate with products from another manufacturer, are commercially viable.

37.    Often, the technologies that JEDEC members select for incorporation into a particular standard are encumbered by patent rights.  Once a patented technology is standardized, the owner of an SEP may have extraordinary leverage against the manufacturers of standardized products because the patent owner can, unless restrained, demand and obtain royalties for the use of its patent that greatly exceed the value, if any, that the patented technology would command had it not been incorporated into a standard.  If unwilling to pay such excessive royalties, firms wishing to implement the standard face the risk of being foreclosed from using any portion of the standard, including unpatented and public domain technologies.

38.    This threat of foreclosure, if left unchecked, puts a manufacturer's investment in developing standard-compliant products at risk and, in effect, permits the possibility that the SEP holder may capture up to the value of the standard or implementing product as a whole for each unique implementer, rather than the true value of its specific contribution to the standard, independent of the incorporation of the technology into the standard.  The exploitation of SEP owners to extract unreasonable or discriminatory royalties is referred to as patent "hold-up."

39.    In other words, on account of a patented technology's incorporation into a standard, the standard confers monopoly power upon the owner of an SEP.  This is because the patent owner, with its ability to hold up the industry, has an effective monopoly on the market for products that incorporate the standard and can, without agreeing to license its technology, preclude

or attempt to preclude firms seeking to implement the standard from manufacturing or selling any standard-compliant products.

40.     This is precisely what Netlist seeks to achieve by demanding supra-RAND and discriminatory royalties and requesting injunctive relief from the ITC.   Indeed, the risk of patent hold up is particularly acute when the SEP owner seeks an injunction against implementers of a particular standard.  In seeking an injunction in a district court or an exclusion order from the ITC, as Netlist has done, the SEP owner seeks to increase its leverage over the product manufacturers, wielding its monopoly power to force those manufacturers into a Hobson's choice: either pay the SEP owner supra-RAND royalty rates for a license to the SEPs or stop commercializing the accused products entirely.

41.     To reduce these hold-up risks and the monopoly power that standards inherently confer on SEP owners, JEDEC has adopted a patent policy that seeks to ensure that owners of SEPs license those patents to manufacturers of standard-compliant products on RAND terms and conditions.  Every firm that is a member of a JEDEC committee or a participant in a JEDEC committee meeting, including Netlist, agrees to abide by the JEDEC Patent Policy.

> All Committee Members, as a condition of committee membership or committee Participation, agree to abide by JEDEC rules and procedures, including this JEDEC patent policy ("Patent Policy").

Ex. 1 (JEDEC Manual No. 21T) § 8.2.2.1.

42.     Pursuant to the JEDEC Patent Policy, as a condition of committee membership or participation, all JEDEC committee members agree to disclose "Potentially Essential Patents" relevant to the work of the committee:

> All Committee Members must Disclose Potentially Essential Patents, known to their Representative(s) to be Potentially Essential Patents that are owned or controlled by that Committee Member . . . .

*Id*. § 8.2.3.

43.    The Patent Policy requires that members disclose their "Potentially Essential Patents" for each JEDEC standard under which the patents may be essential, requiring that during <u>each</u> committee meeting "the chairperson should call to the attention of all those present . . . the obligation of all Representatives to inform the committee of any personal knowledge they have of any Potentially Essential Patents," *id*. § 8.2.3, which includes disclosure of "the Standard(s) on which the submitter of the disclosure believes an Essential Patent Claim may read," *id*. § 8.2.1.

44.    The requirement to disclose "Potentially Essential Patents" extends to disclosing pending patent applications. *Id.* § 8.2.1.

45.    JEDEC committee members also agree to license "Essential Patent Claims" on RAND terms and conditions:

> All Committee Members, as a condition of committee membership or committee Participation, agree to Disclose Potentially Essential Patents, as set forth more fully in 8.2.3, and to offer to license their Essential Patent Claims to all Potential Licensees on RAND terms and conditions, if and as consistent with 8.2.3 and 8.2.4.

*Id*. § 8.2.2.1.

46.    JEDEC committee members also agree to license on RAND terms any "Essential Patent Claims" included in their patent applications:

> For any Essential Patent Claims held or controlled by the entity, *pending[,] or anticipated to be filed*, which are or may be required to implement a Standard that may result from the JEDEC Standard Activity, the entity hereby makes one of the following commitments: . . . A license will be offered . . . under reasonable terms and conditions that are free of any unfair discrimination.

*Id*. § 8.2.5 (emphasis added).

47.     The JEDEC Patent Policy defines "Potentially Essential Patent" as a patent that is reasonably believed to contain one or more Essential Patent Claims.  *Id*. § 8.2.1.  "Essential Patent Claim" is defined as those "Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard."  *Id.*

48.     The JEDEC Patent Policy provides that the disclosure of Potentially Essential Patents "shall be made as early as reasonably possible" and documented by submission to JEDEC of either a "License Assurance/Disclosure Form" or a "Notice of Refusal."  *Id*. § 8.2.3.

49.     A License Assurance/Disclosure Form (also known as a "Letter of Assurance" or "LOA") is used to declare that the committee member commits to license its SEPs to all potential licensees on RAND terms.  By contrast, a Notice of Refusal ("NOR") is used to declare that the member is not "willing to offer to license Essential Patent Claims . . . on RAND terms to all Potential Licensees."  *Id*. § 8.2.3.1.  In order to be effective, any such LOA or NOR must be delivered to the JEDEC Legal Department within thirty (30) calendar days of a draft specification's completion.  *Id.*

50.     Member companies who disclose and agree to license their patents on RAND terms do so via the aforementioned LOA, identifying the relevant JEDEC standard(s) and making one of the two following commitments specified by the JEDEC Patent Policy:

> For any Essential Patent Claims held or controlled by the entity, pending or anticipated to be filed, which are or may be required to implement a Standard that may result from the JEDEC Standard Activity, the entity hereby makes one of the following commitments:
>
> (i)     A license will be offered, without compensation, under reasonable terms and conditions that are free of any unfair discrimination to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard, subject to the terms and conditions in 8.2.4; or

(ii)     A license will be offered, to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard under reasonable terms and conditions that are free of any unfair discrimination, subject to the terms and conditions in 8.2.4.

*Id*. § 8.2.5.

51.     JEDEC has a strong policy favoring adopting technologies in the public domain or for which JEDEC has received an assurance from the patent owner that it will license a potentially essential patent on RAND terms.  In the event of receipt of an NOR, the JEDEC Patent Policy directs that "JEDEC committees and task groups shall consider reasonable workarounds and technical alternatives."  *Id*. § 8.2.2.2.  The policy further directs that if the JEDEC board has "a credible indication that the patent owner or applicant is unwilling or unable to grant licenses, with or without compensation, on RAND terms, then the Board *shall not* approve the issuance of the standard" without first "consider[ing] whether the committee used diligent efforts, if appropriate under the circumstances, to develop a standard that does not require the use of the Essential Patent Claim(s)" and adding to the standard "[a] special legal disclaimer."  *Id*. § 8.2.7 (emphasis in original).

52.     According to JEDEC's Patent Policy, disclosures and commitments with respect to one patent are deemed to include all patents claiming priority to the same filing.  *Id*. § 8.2.1.  Committee members are therefore obligated to license on RAND terms later-issuing SEPs that claim priority to patents disclosed to JEDEC.

53.     The JEDEC Patent Policy provides that it is to be interpreted and governed under the laws of the State of New York.  *Id*. § 8.2.10.  Although the JEDEC Manual No. 21 has been updated and amended from time to time, upon information and belief, all of the relevant provisions of the JEDEC Patent Policy have been materially the same at all times relevant hereto.

16

III.    **Netlist's Patent Monetization Business**

A.    **Overview of Netlist's Business**

54.    Netlist is headquartered in Irvine, California, and has been incorporated in Delaware since 2000.  Netlist claims to be a pioneer in the memory module industry, noting in its public filings that it owns over 100 patents, including numerous patents that Netlist has alleged are essential to practicing JEDEC standards.  But contrary to Netlist's public-facing characterizations, its true business model is to (a) litigate and license its patent portfolio to the manufacturers of JEDEC-compliant memory modules, and (b) resell fully functional products from the original manufacturers, particularly SK hynix.  Netlist does not compete with Samsung, SK hynix, or Micron in the manufacture and sale of memory module products.

55.    For instance, in its most recent public annual report, Netlist disclosed that it spent approximately $42.6 million and $38 million in legal fees in 2023 and 2024, respectively. Ex. 2 (Netlist 2024 10-K) at 49.  These numbers dwarf the $9.2 million and $8 million Netlist spent on research and development in those years.  *Id*.  Further, Netlist's research and development expenses for 2023 and 2024 are not dedicated to developing new products: Netlist's most recent annual report admits that it expends resources in the "design and engineering work involved in developing application-specific products" for its customers—i.e., customizing existing products for customers.  *Id*. at 9.

56.    Netlist's sales revenue is predominantly from component products that Netlist purchases for resale to end-customers.  In its most recent annual report, Netlist acknowledged that the "vast majority of [its] net product sales in recent periods have been generated from resales of products, including products sourced from SK hynix."  *Id*. at 10.

17

57.     In 2024, Netlist disclosed $147.1 million in net sales revenue, with sales costs of $144.2 million, earning a gross profit of $2.9 million.  *Id*. at 49.  Netlist ultimately ended 2024 with a net loss of $53.9 million. *Id.* at 57.

58.     Netlist is a member of JEDEC.  On information and belief, Netlist first joined JEDEC in 2001, but Netlist's membership in JEDEC has not been continuous since that time.  Netlist's refusal to license its patents on RAND terms has led to periods during which Netlist was barred from JEDEC membership.

59.     As noted, Netlist portrays itself as a pioneer that holds dozens of seminal patents in the memory module industry.  But despite Netlist representatives attending JEDEC meetings for decades, Netlist has not meaningfully participated in the development of the standards, nor, on information and belief, has Netlist proposed any new technology to JEDEC to advance any accused JEDEC standards.  For instance, in the JC-40.4 subcommittee from May 30, 2011 to December 30, 2013, the subcommittee and timeframe during which JEDEC was developing standards relevant to patents Netlist has asserted against Samsung, there were hundreds of JEDEC contributions from a variety of members, including committee presentations, ballot responses, task group presentations, and modular design files.  Netlist had zero contributions during that timeframe.  This is despite Netlist's current claim to have been the first to market LRDIMMs and to be the owner of many alleged SEPs related to LRDIMM technology.

60.     Upon information and belief, Netlist has never made a technical contribution to a JEDEC committee or subcommittee for the JEDEC specifications related to the accused products.  Rather, as described below, Netlist participates in JEDEC to gain industry knowledge, attempt to patent the technologies under consideration at JEDEC, and subsequently

hold up actual memory module manufacturers with alleged SEPs by demanding royalties to license its portfolio that are unreasonable and discriminatory.

### B.   Overview of Netlist's Asserted Patents

61.   Netlist's patents are generally directed to DIMMs and HBM.  For instance, U.S. Patent No. 10,217,523 ("the '523 patent") is a patent that purports to teach "self-testing."  By "self-testing," the '523 patent refers to having the memory module test the individual memory cells of the DRAM by itself (without external testing equipment) to confirm that the memory cells are in working order.  Netlist has alleged in previous litigation that the '523 patent is essential to certain JEDEC standards, including 21-C and JESD79-4.

62.   Netlist's U.S. Patent Nos. 9,824,035 ("the '035 patent") and 10,268,608 ("the '608 patent") (collectively, the "Isolation Device Patents") relate to the use of "isolation devices" in computer memory modules.  The '035 and '608 patents purportedly relate to the problem of isolation devices and their associated memory devices being distributed across the memory module at varying distances from the module control device.  The patents teach the use of a signal alignment circuit in each isolation device to determine transmission timing.  Netlist has alleged in previous litigation that the '035 and '608 patents are essential to certain JEDEC standards, including 21-C.

63.   Netlist's U.S. Patent No. 12,373,366 ("the '366 patent") relates to "Flash-DRAM Hybrid Memory Modules."  The '366 patent purports to monitor input power to the memory system from a system power supply and transfer data from volatile memory to non-volatile memory when certain input power thresholds are exceeded. Netlist has claimed that the alleged invention of the '366 patent is essential to certain JEDEC standards, including by disclosing a parent patent to JEDEC as essential to certain DIMM standards.

64.     Netlist's U.S. Patent No. 10,025,731 ("the '731 patent") purports to describe a memory module that has a connector coupled to a memory controller of a computer system.  The patent discusses the use of a circuit that can purportedly reduce signal reflection/noise at certain interfaces.

65.     Netlist is the current assignee of U.S. Patent Nos. 8,489,837 ("the '837 patent"), 9,535,623 ("the '623 patent"), 9,858,218 ("the '218 patent"), 10,474,595 ("the '595 patent"), 11,386,024 ("the '024 patent"), and 11,880,319 ("the '319 patent") (collectively, the "Notification-Signal Patents"), which are also directed at DIMMs.  This patent family purports to disclose the system memory controller handing off initialization to the memory module and the memory module providing a signal (i.e., a "handshaking") indicating the module completed its initialization.  Netlist has alleged in previous litigation that the Notification-Signal Patents are essential to certain JEDEC standards, including JESD82-31.

66.     Netlist has asserted U.S. Patent No. 12,308,087 ("the '087 patent") against Samsung HBM products.  The '087 patent purports to describe a memory package having "stacked array dies" and methods.  According to the patent, memory modules may include a number of memory packages, which may themselves include a number of array dies that are packaged together.  A "driver" is used for "driving signals" between dies. In its ITC complaint, Netlist construes the '087 patent in a manner that would render it essential to certain JEDEC HBM standards, including JESD235D.

## IV.    Netlist's Misconduct at JEDEC

67.     As described below, Netlist attended JEDEC meetings for years, and on multiple occasions refused to license its patents to implementers of JEDEC standards.  Moreover, during its years in JEDEC, rather than advance the standards development process, Netlist gathered information about the technology being considered for adoption by the industry and filed patent

20

applications hoping to claim that technology as its own. Netlist then chose not to disclose its potential SEPs to JEDEC until the industry, including Samsung, had already adopted the technology that Netlist alleges its patents cover. Later, when Netlist finally disclosed its purported SEPs to JEDEC, Netlist made false promises that it would comply with its RAND obligations—promises Netlist made to JEDEC for the sole purpose of regaining admission to JEDEC and resuming its practice of patenting technologies under consideration by JEDEC committees.

### A.    Netlist Makes Intentionally False Commitments to License Its Patents on RAND Terms.

68.    As explained above, JEDEC imposes an obligation on its members to license their patents on RAND terms. But Netlist never intended to comply with this obligation, and instead intentionally made false RAND commitments to JEDEC related to patents that Netlist alleged were essential. Netlist made its intent clear on two occasions when it submitted NORs to JEDEC, refusing to license its patents on RAND terms. This led to JEDEC revoking Netlist's membership, with Netlist being absent from JEDEC for nearly four years in total. While it later submitted LOAs to regain its JEDEC membership, on information and belief, Netlist never intended to comply with the RAND commitment or other JEDEC polices.

69.    From December 2010 through September 2011, Netlist refused to license certain patents on RAND terms to JEDEC members. As a result, JEDEC revoked Netlist's membership. Specifically, on December 6, 2010, Netlist submitted NORs for a number of patents and applications that Netlist admitted were potentially essential, refusing to license the following patents and applications on RAND terms: U.S. Patent Nos. 7,619,912 ("the '912 patent"); 7,254,036; 7,286,436; 7,289,386; 7,375,970; 7,532,537; 7,630,202; and 7,636,274; and U.S. Patent Application Nos. 12/577682; 12/629827; 12/422853; 12/504131; and 12/761179.

70.    Netlist submitted its refusals to JEDEC after filing a patent infringement lawsuit against Samsung's customer Google.  Netlist commenced the lawsuit, in which Netlist alleged that Google infringed a potential SEP (the '912 patent), in the Northern District of California on December 4, 2009.

71.    On February 12, 2010, Google alleged in the lawsuit that Netlist's failure to disclose the '912 patent to JEDEC constituted fraud and deceit by concealment, misrepresentation, and breach of contract.  On December 6, 2010, Netlist disclosed the '912 patent to JEDEC by submitting an NOR, thus expressly indicating its intent to demand unreasonable and/or discriminatory (i.e., non-RAND) terms from its potential SEP, the '912 patent.

72.    In September 2011, JEDEC reinstated Netlist on the condition that Netlist submit LOAs for the same patents that Netlist had previously refused to license on RAND terms. Netlist did so.  On September 7, 2011, Netlist executive and engineer Jayesh Bhakta submitted LOAs to JEDEC for the patents and applications that Netlist had previously refused to license on RAND terms, disclosing the patents as potentially essential to standards under development in the JC-40, JC-42, or JC-45 subcommittees.  But, on information and belief, Netlist's LOAs were fraudulent, as Netlist never intended to comply with its RAND commitment or other JEDEC commitments.

73.    Less than three-and-a-half years later—in the midst of efforts by Netlist to demand licensing royalties from Samsung (as discussed below)—Netlist again stated it would not license its intellectual property on RAND terms.  Specifically, Netlist withdrew from membership in JEDEC committees JC-40, JC-42, and JC-45 in February 2015, seeking to take back its RAND commitment by again submitting NORs.  JEDEC committees JC-40, JC-42, and JC-45 all relate to the development of memory module technology, with JC-40 dealing with digital integrated

circuits, JC-42 dealing with memory integrated circuits, and JC-45 dealing with DRAM modules, cards, and socket interfaces.  Among the patents that Netlist refused to license on RAND terms in February 2015, despite its long participation in JEDEC, was U.S. Patent No. 9,128,632, the parent of two alleged SEPs that Netlist recently asserted against Samsung, the '608 and '035 patents.

74.    Netlist's 2015 refusal to abide by its RAND commitments coincided with Netlist approaching Samsung for a license to its patent portfolio.  On November 12, 2015, nine months after Netlist's NORs, Netlist and Samsung executed an agreement that included a paid-up license for $8 million to the patents Netlist now asserts against Samsung.

75.    Netlist's absence from JEDEC lasted until 2018, when in May 2018 Netlist requested reinstatement from the JEDEC board of directors.  The board of directors approved the request on the condition that Netlist would agree to be bound by the JEDEC Patent Policy, including the RAND commitment, regarding work conducted in JC-40, JC-42, and JC-45 during the time Netlist had not participated in the committees, since and including February 27, 2015. Netlist agreed to JEDEC's terms in writing, and JEDEC reinstated Netlist on August 14, 2018, retroactive to February 27, 2015.

76.    Just prior to Netlist's reinstatement, Netlist submitted LOAs for a number of its patents.  Specifically, on August 7, 2018, Netlist Vice President of Intellectual Property, Noel Whitley, submitted eighteen LOAs, disclosing Netlist patents as potentially essential to standards under development in the JC-40 subcommittee.  These 2018 LOAs followed Noel Whitley's April 7, 2016 submission of LOAs for four patents as potentially essential to the standards under development in the JC-40 and JC-45 subcommittees, including an LOA for U.S. Patent No. 8,001,434, the parent patent of the '523 patent.

77.    But once again, on information and belief, Netlist's promise in 2018 to abide by its RAND commitments and its April 7, 2016 and August 7, 2018 LOAs was fraudulent. As noted, Netlist waited to disclose its patents to JEDEC until the industry had allegedly adopted its technology, attempting to induce JEDEC, by Netlist's silence, into adopting technology that JEDEC would assume was unencumbered by intellectual property rights. And although Netlist eventually disclosed the patents to JEDEC, on information and belief, Netlist never intended to comply with its RAND commitment or other JEDEC commitments.

78.    Netlist's subsequent actions confirm that its RAND commitment was falsely made. For instance, Netlist sued the industry on certain alleged SEPs, including the '523, '035, and '608 patents, asserting that the patents were essential but demanding supra-RAND royalty rates. When the industry defendants, including Samsung, demanded that Netlist offer a RAND rate and asserted RAND defenses in the district court, Netlist changed course, contending that the patents are not essential and Netlist therefore has no RAND obligation. Indeed, Netlist contends in its recent ITC complaint against Samsung that the '523 patent is not essential to practice the JEDEC standard. *Certain Dynamic Random Access Memory (DRAM) Devices, Products Containing the Same, and Components Thereof*, Inv. No. 337-TA-1472 (I.T.C. Sept. 30, 2025), Complaint, ¶ 20. In an earlier litigation against SK hynix, however, Netlist took the exact opposite position—*i.e.*, Netlist contended the '523 patent *is* essential to JEDEC standards, including JEDEC Standard No. 21-C and JESD79-4. *See Netlist, Inc. v. SK hynix Inc.*, 6:20-cv-194 (W.D. Tex.), D.I. 33 ¶ 46 ("The '523 patent is essential to the JEDEC DDR4 LRDIMM standard.").

79.    The same is true for the '035 patent. In the ITC action against Samsung, Netlist contends the '035 is non-essential, 337-TA-1472, Complaint, ¶ 20, but in an earlier

litigation against Micron, Netlist alleged that the patent is essential to at least JEDEC Standard No. 21-C, *see Netlist, Inc. v. Micron Technology, Inc.*, 6:21-cv-431 (W.D. Tex.), D.I. 1 ¶¶ 26, 78 ("Netlist 'committed' the Asserted Patents to various JEDEC standards pursuant to the JEDEC Patent Policy.").

80.     The same is also true for the '608 patent.  Netlist has alleged that the '608 patent is non-essential in the recent ITC action against Samsung, 337-TA-1472, Complaint, ¶ 20, but Netlist alleged that it was essential to at least JEDEC Standard No. 21-C in an earlier litigation against Micron, *see Netlist, Inc. v. Micron Technology, Inc.*, 6:21-cv-431 (W.D. Tex.), D.I. 1 ¶¶ 26, 109 ("Netlist 'committed' the Asserted Patents to various JEDEC standards pursuant to the JEDEC Patent Policy.").

81.     This about-face on essentiality and RAND commitments is a pattern for Netlist.  In Netlist's first infringement case against Samsung in the Eastern District of Texas, Netlist asserted, *inter alia*, U.S. Patent Nos. 10,949,339 (the "'339 patent"), 11,016,918 (the "'918 patent"), and 11,232,054 (the "'054 patent").  Netlist contended during litigation—including in a letter, interrogatory response, and deposition—that the '339, '918, and '054 patents are essential to practicing certain JEDEC standards.  On the eve of trial, however, Netlist's counsel told the court that, contrary to its previous representations, none of the asserted patents are standard essential and Netlist had no RAND commitment.

82.     Netlist's contradictory positions on essentiality further demonstrate Netlist's scheme to evade its falsely given RAND commitments.  Netlist believes these patents are essential, having admitted this in prior litigations. Netlist also knows that its conduct—including seeking supra-RAND royalties from Samsung and requesting injunctive relief before having made a RAND offer—violates Netlist's RAND commitments with regard to these patents.  To square

this circle, Netlist makes non-essentiality allegations that it knows, or should know, are inconsistent with its infringement claims.

**B.    Netlist Intentionally Failed to Disclose Its Alleged SEPs to JEDEC**

83.    Netlist concealed its allegedly essential patents and applications from JEDEC until after the standards were adopted and the industry began implementing the standards that Netlist alleges necessarily practice its patents.  Once manufacturers began implementing the standards, they were "locked in" to the technology covered by those standards.  This fostered Netlist's goal of holding up and seeking supra-RAND royalties from the industry.  Netlist's silence also furthered its attempt to file patent applications on technology that other JEDEC members presented or disclosed at JEDEC committee meetings.

84.    Upon information and belief, at the time that the JEDEC standards relevant to Netlist's DIMM patents were drafted and approved by JEDEC, Netlist was a member, attended the meetings, and/or was deemed a member of the JC-40, JC-42, and JC-45 committees that developed those standards.  As a member, Netlist had a duty to disclose any applications or patents that it believed were potentially essential to any standard under consideration "as early as reasonably possible."  Ex. 1 (JEDEC Manual No. 21T) § 8.2.3.

85.    JEDEC policy favors adoption of unpatented technology, particularly if a patentee refuses to license on RAND terms.  *Id.* § 8.2.2.2 ("JEDEC committees and task groups shall consider reasonable workarounds and technical alternatives" within "one-hundred twenty (120) calendar days of receiving Notice of Refusal to offer Licenses on RAND Terms").  JEDEC and its members therefore relied on Netlist's silence that the standards did not implicate its technology in developing the relevant JEDEC DIMM and HBM standards.

86.    Netlist never disclosed certain of its alleged SEPs.  For other alleged SEPs, Netlist waited until the industry adopted standardized technology before disclosing them.

87.    Netlist has *never* disclosed to JEDEC the patents it asserts in the ITC action against Samsung.  Netlist has never submitted a NOR or LOA or otherwise disclosed the '087, '366, '608, '523, '035, or '731 patents to JEDEC.  Moreover, in the Notification-Signal Patent family, Netlist has only ever disclosed the '837 patent.

88.    Netlist disclosed related patents to JEDEC years after they issued, and only after industry adoption of the accused JEDEC DDR4 LRDIMM and RDIMM standards.  For example, Netlist disclosed U.S. Patent No. 8,001,434 ("the '434 patent"), the parent patent of the '523 patent, on April 7, 2016, despite the patent issuing on August 16, 2011.  Netlist disclosed the '434 patent as relating to "DDR4 LRDIMM Components; (RCD&DB); High Bandwidth Memory DRAM."  Netlist also disclosed U.S. Patent No. 9,128,632, the parent patent of both the '608 and '035 patents, on April 7, 2016, as relating to "DDR4 LRDIMM Components; (RCD&DB), DDR4 RDIMM."  And, on February 27, 2015, Netlist disclosed U.S. Patent Nos. 8,301,833 ("the '833 patent") and 8,874,831 ("the '831 patent"), the parent patents of the '366 patent, as relating to "DDR4 RCD02 LCOM Protocol and RCW Definitions," despite those parent patents issuing in 2012 and 2014, respectively.  Related to the Notification-Signal Patents, Netlist disclosed the '837 patent, which issued on July 16, 2013, to the JEDEC committees JC-40 and JC-45 as related to DDR4 LRDIMM and DDR4 RDIMM on April 7, 2016.

89.    By the time of these disclosures, JEDEC had been developing for years the standards that Netlist has accused of infringing the '523, '035, '608, '366, and Notification-Signal Patents.  Indeed, the industry had implemented DDR4 RDIMM and LRDIMM standards as early as 2014, as Netlist surely understood.  Netlist had successfully and unfairly waited until the industry had no choice, according to Netlist, but to take a license to Netlist's patents.

90.     Moreover, Netlist disclosed its patents only as related to early versions of the technologies and wholly failed to disclose to JEDEC that its patents were potentially essential to later JEDEC standards.  For instance, Netlist disclosed U.S. Patent No. 8,154,901, the parent patent of the '731 patent, in November 2010 as relating to an early version of LRDIMM technology.  On information and belief, Netlist never disclosed the parent patent or the '731 patent as relating to any later standards.

91.     On information and belief, Netlist has never disclosed the '087 patent or any of its parent patents to JEDEC for any HBM standard.  Netlist failed to disclose the patent family despite the '087 patent being essential to JEDEC HBM standards based on Netlist's infringement read.

92.     On information and belief, Netlist has never disclosed to any JEDEC committee *any* patent as potentially essential to DDR5.  This is so despite Netlist asserting patents in the ITC against Samsung DDR5 products that, if infringed under Netlist's infringement theories, would be essential to certain JEDEC DDR5 DIMM and HBM standards.  Moreover, Netlist has drafted multiple patent applications to read on JEDEC DDR5 standards.  Specifically, Netlist disclosed the '833 and '831 patents to JEDEC with regard to DDR4 memory functionality.  Netlist subsequently attended JEDEC meetings to monitor development of JEDEC DDR5 standards.  On information and belief, once Netlist learned that the DDR5 standards would include a power management integrated circuit ("PMIC"), Netlist filed continuation applications within the '831 and '833 patent family in an attempt to capture the DDR5 standard and PMIC functionality.  Those continuation applications issued as the '918 and '054 patents.  Netlist then sued Samsung and accused certain DRR5 standard-compliant memory products, including the functionality of the JEDEC-compliant PMIC, of infringing the '918 and '054 patents based on the JEDEC standards.

93.     After failing to disclose its alleged SEPs until after the industry had adopted the technology (or not disclosing at all), not only did Netlist begin suing the memory module industry—which, by its silence, Netlist had misled into believing the JEDEC proposals were unencumbered by Netlist's intellectual property rights—but Netlist also demanded ultra-high royalty rates from the industry.  Netlist sought to capture the entire value of the standard and non-standardized technology rather than the amount purportedly attributable to the (derived) technology.

**C.     Netlist Patents Technology from Other JEDEC Members**

94.     On information and belief, Netlist representatives have attended dozens of JEDEC meetings over the decades, including numerous meetings in California, and listened to technological presentations from other JEDEC members.  On information and belief, Netlist has not submitted a technical contribution to JEDEC for the accused JEDEC products.  Instead, Netlist participates in JEDEC for the purpose of listening to technical contributions presented by other JEDEC members and filing patent applications on ideas Netlist learns from other JEDEC members.

**a)     Isolation Device Patents**

95.     On information and belief, Netlist representatives, including Hyun Lee, attended dozens of JEDEC meetings for years and listened to technological presentations from other JEDEC members.  Then, Netlist incorporated key concepts from presentations that Netlist's JEDEC representatives learned during meetings into the Isolation Device Patent family.

96.     Netlist's Isolation Device Patents claim priority to a provisional application filed on July 27, 2012.  Then on July 27, 2013, Netlist filed U.S. Patent Application No. 13/952,599, which is the first application in the line of continuation applications resulting in the '608 and '035 patents asserted against Samsung in the recent ITC action.

97.     On information and belief, Mr. Hyun Lee, a named inventor on the Isolation Device Patents, regularly attended JEDEC meetings for at least the JC-40 committee in 2010, 2011, and 2012, as well as before and after that timeframe, including the meetings occurring on December 9, 2010, in San Francisco, California; on December 8, 2011, in San Diego, California; on March 5, 2012, in Hong Kong, China; and on June 4, 2012, in Washington, DC.  Similarly, Netlist regularly sent individuals to attend meetings for the JC-45 committee.

98.     During the December 9, 2010 JC-40 committee meeting, JEDEC member Intel Corporation ("Intel") presented Committee Item Number 158.01 ("DDR4 LRDIMM Proposal").  Among other things, this proposal disclosed a distributed buffer concept for use in DDR4 LRDIMM.  Hyun Lee attended this meeting.  On information and belief, the draft of DDR4 LRDIMM Proposal was created by employees of Intel and circulated at or before, and discussed at, the JC-40 committee meeting on December 9, 2010 that Hyun Lee attended.

99.     During the December 8, 2011 JC-40 meeting in San Diego, Intel again presented and discussed the DDR4 LRDIMM Proposal.  On information and belief, the draft of DDR4 LRDIMM Proposal was circulated at or before, and discussed at, the JC-40 committee meeting on December 8, 2011 that Hyun Lee attended.

100.    Intel also presented two other items in subsequent JC-40 meetings in 2012, Committee Item Number 0311.14 ("Proposed DDR4 DB Training Modes") at the March 25, 2012 meeting and Committee Item Number 0311.12 ("Proposed DDR DB Buffer Control Words") at the June 4, 2012 meeting.  On information and belief, drafts of Proposed DDR4 DB Training Modes and Proposed DDR DB Buffer Control Words were created by employees of Intel and circulated at or before, and discussed at, the JC-40 committee meetings on March 5, 2012 and June 4, 2012, respectively, both of which Hyun Lee attended.

101. On information and belief, and based on Netlist's alleged scope of the '608 and '035 patents, each of these JC-40 presentations, DDR4 LRDIMM Proposal, Proposed DDR4 DB Training Modes, and Proposed DDR DB Buffer Control Words, disclose materially the same structure and functionality, the MRE (MDQS receive enable) and MRD (MDQS read delay) training, that Netlist has accused of infringing claims of the '035 patent. On information and belief, by virtue of his attendance at those meetings and otherwise, Hyun Lee attended these presentations and was aware of their content, which he shared with others at Netlist. With the assistance of Mr. Lee or using information from Mr. Lee, Netlist then drafted claims with the goal of accusing these structures and features of infringement.

### b) "Notification-Signal" Patents

102. Netlist has attended JEDEC meetings and incorporated key concepts from presentations that Netlist's JEDEC representatives learned during those meetings. For example, other JEDEC members proposed using an open-drain error pin to provide a handshake signal indicating completion of initialization. As described below, Netlist later filed its provisional application to the Notification-Signal Patents allegedly disclosing that proposed technology.

103. On information and belief, Mr. Hyun Lee, the sole inventor of the Notification-Signal Patents, attended a JEDEC meeting on June 4, 2009, in Montreal, Canada. On that day, Inphi Corporation presented a proposal titled "MB Initialization sequence Item 142.35" to the members of JEDEC. This presentation disclosed a system memory controller that hands off portions of an initialization sequence to the memory module, such as MB-DRAM interface training. On information and belief, Mr. Hyun Lee witnessed that presentation and was present for the discussions that occurred about it.

104.   At that same meeting, IDT, Texas Instruments, Montage Technology, and Inphi made another presentation, titled "Memory Buffer Membist for LRDIMM DDR3 MB TG Item 142.43," which disclosed a memory module sending a signal to the system memory controller indicating a status of an initialization procedure, MEMBIST testing, and/or training.   On information and belief, Mr. Hyun Lee also witnessed that presentation and was present for the discussions that occurred about it.   This is, according to Netlist, the notifying signal that provides the final handshake discussed in the Notification-Signal Patents.

105.   On information and belief, after attending the June 4, 2009 meeting and listening to these ideas from other members of JEDEC, Hyun Lee returned to Netlist's office in California and hurriedly completed drafting Provisional Application No. 61/186,799 ("the '799 Provisional"), to which the Notification-Signal Patents all claim priority. Netlist filed the '799 Provisional on June 12, 2009—only eight days after the JEDEC meeting in Montreal.  The '799 Provisional expressly references a "recent proposal in JEDEC for LD-DIMM" and incorporates some of the concepts described in the June 4, 2009 presentations made by IDT, Texas Instruments, Montage Technology, and Inphi, such as disclosing a "method of providing a feedback path from a memory subsystem to the MCH (Memory Controller Hub, e.g., system memory controller) during initialization."

106.   On information and belief, Mr. Hyun Lee derived at least portions of the allegedly inventive aspects of the disclosure of the '799 Provisional from others in attendance at the June 4, 2009 meeting who had made those presentations on behalf of Inphi, IDT, Montage Technology, and Texas Instruments.  But Netlist and Mr. Hyun Lee fraudulently portrayed Mr. Lee as the sole inventor.

107.    As another example, in November 2009, JEDEC sent to JC-40 committee members the draft and final specifications for DDR3 LRDIMMs being considered and voted upon, sending two Committee Letter Ballots with the subject "LRDIMM DDR3 Memory Initialization Chapter Proposal" and "DDR3 LRDIMM Design Specification Body."

108.    By virtue of attendance at JEDEC JC-40 committee meetings and active involvement in JEDEC, on information and belief, Netlist and Mr. Hyun Lee were aware of the draft and final specifications for DDR3 LRDIMMs being considered and voted upon by those subcommittees, including the Committee Letter Ballot that JEDEC sent to committee members in November 2009 with the subject "LRDIMM DDR3 Memory Initialization Chapter Proposal" and the other specifications for DDR3 LRDIMM considered by those committees, such as "DDR3 LRDIMM Design Specification Body." The "LRDIMM DDR3 Memory Initialization Chapter Proposal" discloses, *inter alia*, a training mode called "MB-DRAM Training" that includes two training sequences: "Write Leveling" and "Read Enable Training."

109.    On information and belief, Mr. Hyun Lee and another Netlist representative, Mr. Mario Martinez, attended the September 2009 meeting in San Jose, California, shortly before JEDEC sent the ballots to JC-40 members. Additionally, Mr. Lee and Mr. Martinez attended the next JEDEC meeting in December 2009, where the minutes report that the vote on the LRDIMM DDR3 proposal was discussed and unanimously approved.

110.    As described below, Netlist attempted to claim these training sequence concepts years later in certain Notification-Signal Patents, with Netlist claiming priority for these concepts to the '799 Provisional filed on June 12, 2009.

111.    The JEDEC JC-40 committee continued to develop the standard at issue and later standards related to succeeding technologies. The committee began developing the JESD82-

33

32 standard related to DDR4 Data Buffer Definition no later than 2014 and published the final JESD82-32 standard in December 2016. In that standard, certain DDR4 memory modules require two training sequences, similar to the training sequences disclosed in the LRDIMM DDR3 proposal from 2009.

112.    On April 1, 2016, Netlist filed the continuation application that became the '218 patent. As noted, in that patent Netlist claimed, *inter alia*, a memory module "configured to be trained with one or more training sequences; wherein the memory module in the second mode is configured to perform one or more memory read or write operations." Ex. 3 at 14:54–58. However, the '799 Provisional has no support for this limitation in the '218 patent claims (among other limitations). As the Patent and Trial Appeal Board ("PTAB") later found in an *inter partes* review ("IPR") regarding the '218 patent, the '799 Provisional to which the '218 patent claims priority "does not explicitly discuss training sequences." IPR2020-01044, Paper 13 at 31. The PTAB therefore "d[id] not find that the evidence demonstrates sufficient written description support as to this limitation" and did not accord the '218 patent priority back to June 2009. *Id.*

113.    On information and belief, Netlist did not invent the full scope of the claims in the '218 patent, as it represented to the U.S. Patent and Trademark Office ("Patent Office") in its application for the '218 patent. On information and belief, Netlist simply took certain ideas, such as "training," from JEDEC meetings that Mr. Hyun Lee, among other Netlist representatives, attended as early as 2009.

114.    Having persuaded the Patent Office to issue the patent with a priority date in 2009, Netlist then sprung its trap on the industry. As described below, Netlist quickly began asserting its deceptively and fraudulently obtained patents against memory module manufacturers, including Samsung, in bad faith, knowing that Netlist did not invent the full scope of the claimed

subject matter in at least the Notification-Signal Patents and knowing that the Notification-Signal Patents were invalid.

115.    Netlist also incorporated these or substantially similar limitations into other Notification-Signal Patents (i.e., the '623, '595, '024, and '319 patents), which all contain claims that are patentably indistinct from the claims of the '837 and/or '218 patents.

116.    Netlist did not disclose the JEDEC presentations or materials—MB Initialization Sequence Item Number 142.35, Memory Buffer Membist for LRDIMM DDR3 MB TG Item Number 142.43, LRDIMM DDR3 Memory Initialization Chapter Proposal, or DDR3 LRDIMM Design Specification Body—to the Patent Office during the prosecution of the '837 and '218 patents.  On information and belief, Netlist's withholding of these materials from the Patent Office was made with deceptive intent, given Netlist's and Mr. Hyun Lee's knowledge of the references and their materiality to patentability.  Regarding materiality, the PTAB found, for instance, that the November 2009 "LRDIMM DDR3 Memory Initialization Chapter Proposal," in combination with another reference, likely invalidated the '218 and '595 patents. IPR2022-00062, Paper 14 at 26; IPR2022-00064, Paper 14 at 24.

### c)    "Stacked Array Die" Patent

117.    Netlist's prosecution of the '087 patent follows a familiar pattern of Netlist attending JEDEC meetings and incorporating ideas presented by others into Netlist patent applications.

118.    Netlist representatives attended JEDEC meetings in 2010, during which JEDEC members discussed numerous details related to 3D stacked ("3DS") memory chips.  For example, at the September 2010 meeting, Mario Martinez attended the JC-42.3 committee meeting on behalf of Netlist.  At this meeting, the members discussed various presentations and ballots

related to 3DS memory, including Item Numbers 1655.00, 3D Stack DDR3 TG; 1655.10, DDR3 SDRAM 3D Stacked Addressing; 1655.13, 3DS MRS Register Extensions; 1664.96, 3DS DRAM Timing; and 1665.14, DDR3 3DS Timing Diagram. Mr. Martinez also attended the JC-40 meeting. This committee discussed 3DS memory including Item Numbers 142.62, Next Generation MB+ for >128MB 3DS modules; and 157.00, DDR3 3DS Stack Register. Similarly, Mr. Martinez and his colleague John Smolka attended the JC-45 meeting. At this meeting, Intel presented Item Number 2192.59, 3DS-DDR3 LRDIMM, for the first time. Netlist did not present any of these items.

119. On November 3, 2010, shortly after attending this meeting, Netlist filed Provisional Application No. 61/409,893, titled Architecture for Memory Module with Packages of Three-Dimensional Stacked (3DS) Memory Chips. This short provisional application focuses not on the stacked array die disclosed in the '087 patent, but on 3DS DIMMs, including both RDIMM and LRDIMM. The application includes only three figures.

120. Later, Netlist representatives also attended JEDEC meetings during 2011. For example, Mario Martinez attended the JC-42 meeting in June 2011, in which Item Number 6.11.0 was a High Bandwidth Memory TG Report. This report included diagrams showing two different DRAM stacks using through-silicon vias ("TSVs"): Pt-2-Pt Single Load (meaning one connection to each die) and Pt-2-Pt Multi-Drop (multiple dies attached to each connection). Netlist did not present any of these items; others did.

121. In September 2011, Hyun Lee attended the JC-42 meeting during which Item Number 1797.00, Future High Bandwidth Memory TG, was discussed. This presentation included a list of consensus features and other discussion points. These consensus features

included the use of TSVs to connect to the DRAM chips in the stack and unidirectional interconnects. Netlist did not present any of these items; others did.

122.    Having attended these meetings, Netlist then filed U.S. Patent Application No. 13/288,850 on November 3, 2011, which became U.S. Patent No. 8,787,060.  The '850 application, but not the provisional application, added figures and disclosure for the first time related to die stacks and the use of TSVs to connect the dies disclosed by others in the earlier June 2011 and September 2011 JEDEC meetings discussed above.  Yet Netlist claimed priority to the provisional application, attempting to obtain a priority date that predated the inventions that Netlist had learned from JEDEC meetings.

123.    The '087 patent issued on May 20, 2025, from an application filed on March 14, 2022.  The '087 patent claims priority through a chain of continuations applications to Provisional Application No. 61/409,893 and U.S. Patent Application No. 13/288,850 ("the '850 application").  The issued claims include limitations directed to features disclosed in the JEDEC meetings that Netlist representatives attended, including, for example, stacked DRAM dies, unidirectional interconnect, and TSVs.  Netlist has now asserted these claims against HBM modules that comply with JEDEC standards, despite the fact that, during prosecution of the '850 application, the inventor disclaimed DRAM dies in favor of other types of memory in order to distinguish a prior art reference.

V.    **Netlist's Industry-Wide Litigation Campaign**

124.    Netlist has initiated protracted patent infringement litigation against all major DRAM manufacturers, beginning with SK hynix.  From 2016 through 2021, Netlist filed two patent infringement actions against SK hynix in the ITC, two in the Central District of California, two in the Western District of Texas, and two in China and Germany.  After the ITC

found no infringement and the PTAB invalidated all challenged claims of nine of Netlist's patents and the majority of claims in two additional patents, Netlist and SK hynix settled in 2021.

125.    Specifically, Netlist began its litigation campaign against SK hynix by asserting, among other patents, the '837 patent, one of the Notification-Signal Patents, in a district court lawsuit. *Netlist, Inc. v. SK hynix Inc.*, No. 8:16-cv-01605 (C.D. Cal. Aug. 31, 2016), D.I. 1. Netlist alleged that the '837 patent is essential to practice the relevant JEDEC standards. Netlist immediately followed that district court action with a corollary case at the ITC, seeking an exclusion order in the ITC against certain SK hynix DIMM products, allegedly without making a RAND license offer. *In re Certain Memory Modules*, No. 337-TA-1023 (Sept. 1, 2016). Netlist alleged in the ITC action that the '837 patent is essential to practice the relevant JEDEC standards. The PTAB found all '837 patent claims invalid. *See* IPR2017-00548, Paper No. 25.

126.    Two months after the ITC's initial determination finding no infringement of the '837 patent, Netlist filed additional district court and ITC actions against SK hynix in which Netlist asserted two patents, including the '623 patent, which is a continuation of the '837 patent. *Netlist, Inc. v. SK hynix Inc.*, No. 8:17-cv-1030 (C.D. Cal.), D.I. 1; *In re Certain Memory Modules*, No. 337-TA-1089 (Oct. 31, 2017), Doc. No. 627249. Netlist alleged that the '623 patent is essential to practice the relevant JEDEC standards. The PTAB found the patent invalid, determining that all claims of the '623 patent were unpatentable. *See* IPR2018-00303, Paper No. 42. The ITC ultimately determined that SK hynix did not violate Section 337.

127.    Netlist subsequently asserted the '523, '218, and '595 patents against SK hynix in the Western District of Texas. *Netlist, Inc. v. SK hynix Inc.*, No. 6:20-cv-00194 (W.D. Tex. June 9, 2020), D.I. 33. As mentioned, the '218 and '595 patents are continuations of the '837 patent and are in the same family as the '623 patent. In response, SK hynix filed IPRs on the '523,

'218, and '595 patents, which the PTAB instituted.  Upon settlement, SK hynix dismissed its IPR

proceedings against Netlist patents.

128.     Netlist and SK hynix ultimately settled their disputes through an agreement

in which ███████████████████████████████████████████████████████████████

███████████████████  Upon settlement, SK hynix dismissed its IPR proceedings against

Netlist patents.

129.     On May 28, 2020, Netlist began its ongoing litigation with Samsung by

filing a lawsuit alleging breaches of the parties' license agreement in the Central District of

California and subsequently seeking to terminate Samsung's license to Netlist's entire patent

portfolio.  Since then, Netlist has filed four complaints in the Eastern District of Texas against

Samsung, with two of the infringement suits also including Samsung's customer, Avnet.  Two of

Netlist's Texas cases have proceeded through trial and verdict.

130.     In the first case in Texas, Netlist asserted six patents against Samsung

related to DIMMs and HBM.  Netlist proceeded to trial on five patents, and the jury awarded

Netlist damages—a verdict that was effectively rendered moot when the PTAB subsequently

found that the challenged claims in all five patents were unpatentable.  The district court and PTAB

cases are pending appeal.

131.     In the second case, Netlist asserted four patents, including the '608 patent,

relating to DIMM products.  Netlist proceeded to trial on three patents, and the jury in the Eastern

District of Texas found against Samsung, awarding Netlist damages.  The PTAB again found that

all patents-in-suit except the '608 patent were unpatentable, leaving intact the jury verdict against

Samsung only for alleged infringement of the '608 patent.  The district court and PTAB cases are

pending appeal.  The '608 is also the subject of an ongoing *ex parte* reexamination at the Patent Office.

132.    The other two cases Netlist filed against Samsung in the Eastern District of Texas remain pending.  On May 20, 2025, Netlist filed suit against Samsung on the '087 patent seconds after the patent issued from the Patent Office.  *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:25-cv-557-JRG (E.D. Tex.).  Netlist later amended its complaint to add the '731 patent. Netlist also filed an infringement suit on the '366 patent on July 28, 2025, again filing its action seconds after the patent issued from the Patent Office.  *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:25-cv-748 (E.D. Tex.).

133.    Samsung filed five actions seeking declarations that Samsung has not infringed the '523, '218, '595, '024, '319, '087, '731, '366, and '035 patents.  Netlist counterclaimed for infringement on the '523, '218, '595, '024, and '319 patents.

134.    Netlist also filed suit against Samsung in Germany, asserting two patents against Samsung's DDR4 LRDIMM memory modules.  *Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, Nos. 4c O 31/22, 4c O 45/22 (Düsseldorf Regional Court), both of which were invalidated in nullity actions.

135.    As noted, on September 30, 2025, Netlist filed a complaint in the ITC against Samsung and its customers, Google and Super Micro.  In filing suit in the ITC, Netlist seeks an exclusion order against Samsung DDR5 DIMM and HBM products that allegedly infringe Netlist's patents, including patents that Netlist has alleged are essential to practicing certain JEDEC standards.

136.    Netlist has also been in protracted litigation against Micron that remains ongoing.  On April 28, 2021, Netlist filed two patent infringement actions against Micron in the

Western District of Texas. On June 10 and August 1, 2022, Netlist filed two complaints for patent infringement against Micron in the Eastern District of Texas. On May 20, 2025, Netlist filed a fifth patent infringement action against Micron in the Eastern District of Texas. On July 28, 2025, Netlist filed its sixth patent infringement action against Micron in the Eastern District of Texas. Netlist has asserted many of the same patents against Micron as it has against Samsung, and the infringement allegations for those patents are based on the same JEDEC-compliant technology.

## VI.    Netlist's Bad-Faith License Negotiations with Samsung

137.    After making intentionally false promises to JEDEC regarding its intention to license its SEPs on RAND terms and conditions, Netlist began a sprawling, worldwide litigation campaign against Samsung and its customers, which Netlist accompanied with demands for unreasonable and discriminatory royalties for alleged SEPs, patents for which Samsung had already paid $8 million for a perpetual worldwide license. Having failed in its efforts to extort such improper payments from Samsung, Netlist has now requested that the ITC enjoin importation of Samsung JEDEC standard-compliant products. Rather than offer a RAND license as its commitment to JEDEC requires, Netlist wields the risk of ITC exclusion in an attempt to extract supra-RAND licensing terms.

### B.    Netlist Terminates Samsung's Perpetual, Portfolio License and Commences Its World-wide Litigation Campaign to Extract Supra-RAND Royalties.

138.    On November 12, 2015, Netlist and Samsung entered into a Joint Development and License Agreement (the "Agreement" or "JDLA"), which contains cross-license, joint development, and product supply provisions. In the past several years, Netlist has demanded that Samsung pay outrageous royalties to license Netlist's patents—demands that are made even more egregious given that Samsung already paid Netlist for a comprehensive license to its entire patent portfolio.

41

139.    In the Agreement, Netlist granted Samsung and its subsidiaries a paid-up, worldwide, non-exclusive license to all patents owned or controlled by Netlist or any of its subsidiaries having an effective first filing date on or prior to November 12, 2020.  The license extends through the expiration of the last-to-expire of the licensed patents.

140.    Samsung similarly granted Netlist and its subsidiaries a paid-up, worldwide, non-exclusive license to all patents owned or controlled by Samsung or any of its subsidiaries having an effective first filing date on or prior to November 12, 2020.

141.    The Agreement required Samsung to make a payment to Netlist of $8 million subject to the terms and conditions therein.

142.    Netlist has gone to great lengths to back out of its license with Samsung, with the goal of extracting additional, supra-RAND royalties.  On May 27, 2020, Netlist's Chief Licensing Officer, Marc J. Frechette, wrote to Mr. Seung Min Sung of Samsung and alleged that Samsung materially breached the JDLA by "repeatedly fail[ing] to fulfill Netlist's request for NAND and DRAM products throughout the term of the Agreement," and by deducting withholding taxes from the $8 million payment.  Netlist did not allege, and has never alleged, that Samsung breached the Agreement in any way related to the patent cross-license.  In the same letter—which was the first time Netlist raised its breach allegations—Mr. Frechette informed Mr. Sung that Netlist had filed a complaint in U.S. District Court for the Central District of California with respect to the alleged breaches by Samsung and provided a copy of the complaint for reference.  *Netlist Inc. v. Samsung Elecs. Co., Ltd.*, No. 8:20-cv-00993-MCS (C.D. Cal.) ("Breach Action").

143.    The breach allegations were a pretext for termination.  Shortly after making those allegations and filing suit, Netlist's Chief Licensing Officer, Marc J. Frechette, wrote to

Mr. Sung and stated that "Netlist is hereby terminating, effective immediately, the Agreement including the patent license granted to Samsung." One week later, on July 22, 2020, Netlist amended its complaint in the Breach Action, seeking a declaration that the license it granted Samsung, but not the license Samsung granted Netlist, was terminated.

144.    Shortly thereafter, on October 15, 2020, Netlist's California counsel sent a "Notice of Infringement" letter addressed to Samsung's California counsel and Samsung Semiconductor, Inc., a Samsung California subsidiary. Netlist stated that because it had terminated the Agreement, "Samsung is no longer licensed to any of Netlist's portfolio of patents." Netlist further asserted that its patents relate to LRDIMMs and RDIMMs. Netlist then alleged: "Despite the termination of the Joint Development and License Agreement, Samsung continues to unlawfully utilize Netlist's innovations and to infringe Netlist's patents, including United States Patent Nos. 10,217,523, 10,474,595, and 9,858,218." Netlist concluded the letter by demanding that "Samsung and its subsidiaries honor third-party intellectual property rights" and engage in "formal licensing discussions," with Netlist "reserv[ing] all rights and remedies" with respect to the alleged infringement.

145.    The purpose of Netlist's Breach Action became especially evident after the court granted summary judgment that Netlist had properly terminated Samsung's license effective July 20, 2020. *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 8:20-cv-00993-MCS, D.I. 186 (C.D. Cal.). The court subsequently held a jury trial on damages for the alleged failure to fulfill Netlist's orders for NAND and DRAM products, and the jury returned a verdict in Samsung's favor, finding that Netlist failed to prove that it suffered any damages for this alleged breach. *See* Breach Action, D.I. 276. Despite losing at trial, Netlist issued a press release claiming to be "very pleased with the overall outcome of the case as it confirmed that Samsung no longer has a valid

license to Netlist patents and therefore requires a licensing agreement." Netlist Provides Update

on Action in Federal Court Against Samsung, https://investors.netlist.com/news/netlist-provides-

update-on-action-in-federal-court-against-samsung/a661884d-0025-46ea-a055-bae8d8e4570b

(last visited December 10, 2025).

146.    The Breach Action is on appeal, and Samsung continues to dispute that

Netlist properly terminated Samsung's license under the Agreement.

**C.    Netlist Fails to Make a RAND Offer and Negotiate in Good Faith with Samsung.**

147.    Since purporting to terminate the parties' agreement, Netlist has failed to

negotiate in good faith for a license to Netlist's patent portfolio and instead has made outrageous

demands.

148.    For example, in correspondence dated June 8, 2022, from Netlist's Irvine,

California office, Netlist's Legal Counsel and Director of IP Strategy, Jason Sohi, demanded that

Samsung take an LRDIMM-only license and pay Netlist a royalty that is orders of magnitude

higher than the amount the parties had agreed to in 2015 in the JDLA, which included a license

for the entirety of Netlist's patent portfolio. The letter also included a list of "Netlist patents that

are essential to implement JEDEC standards for DDR4 LRDIMMs," for which Netlist demanded

Samsung take a license. The list included patents that had already been invalidated, as well as the

'218 and '595 patents—which, on information and belief, Netlist knew were invalid and derived,

at least in part, from the work of others at JEDEC. The list of "Netlist patents that are essential to

implement JEDEC standards" also included three of the ITC patents that Netlist now claims are

not essential: the '608, '523, and '035 patents.

149.    As further evidence of Netlist's bad-faith negotiations, in its

correspondence Netlist demanded that Samsung pay a royalty that was inordinately higher than

the implied per-unit royalty that SK hynix paid in settling its litigation with Netlist, especially considering that, on information and belief, SK hynix received a significantly broader license than the DDR4 LRDIMM-only license that Netlist proposed to Samsung. In fact, based on publicly available information, Netlist's royalty demand of Samsung exceeded the royalty Netlist agreed to with SK hynix ████████████████████ In so demanding, Netlist eschewed its obligations to offer a license on non-discriminatory terms—in addition to Netlist's terms being wholly unreasonable.

150.    As noted above, the three major DRAM manufacturers make memory modules that are generally interchangeable products designed to be included in larger systems. The manufacturers' market share is highly dependent on price. Netlist's discriminatory license demand to Samsung compared to SK hynix puts Samsung at a competitive disadvantage against its competitor.

151.    Netlist continued to demand egregious license royalties in later correspondence sent to Samsung from Jason Sohi from Irvine, California, dated July 1, 2022, September 9, 2022, December 2, 2022, February 16, 2023, February 23, 2023, and March 24, 2023. On June 4, 2023, Eric Lucas, Vice President of Licensing, sent Samsung another letter from Irvine, California, that included a revised but equally outrageous license demand, proposing that Samsung pay Netlist nearly ██████████████████████████████████████.

152.    That Netlist's royalty demands exceed RAND terms is shown by the aggregate royalty of implementing the JEDEC standards that would result from accepting Netlist's outrageous demands. DRAM modules implement many technologies, with many other entities owning patents that may be essential to implementing the JEDEC standards. No entity could realistically implement the JEDEC standards for DRAM modules if subjected to licensing

demands from all SEP holders on the scale of Netlist's demands.  For instance, since 2010 well over a dozen JEDEC members have disclosed numerous patents as potentially essential to JEDEC standards related to DIMMs.  Netlist's licensing demands and conduct therefore amount to patent hold-up.

153.    As described below, Netlist is also seeking an exclusion order against Samsung at the ITC related to a number of patents that Netlist has alleged are standard essential. Thus, Netlist seeks to use its leverage as a holder of allegedly essential patents, coupled with the threat of an injunction, to force Samsung to pay outrageously high, non-RAND licensing royalties. This breach of Netlist's obligations is further compounded by the fact that Netlist fraudulently obtained certain alleged SEPs

**D.    Netlist Knowingly Asserts Invalid Patents Against Samsung.**

154.    Netlist has knowingly alleged infringement by Samsung of invalid patents in bad faith.

155.    Netlist understood that its Notification-Signal Patents were invalid based on its litigation with SK hynix.  As noted, Netlist asserted the '837 Notification-Signal Patent against SK hynix in 2016, and the PTAB later found all claims of the patent invalid.  *Supra* ¶ 125.  Netlist later asserted the '623 patent against SK hynix on October 31, 2017, and the PTAB found that all claims of the '623 patent are unpatentable as obvious.  *Supra* ¶ 126.  Finally, on March 17, 2020, Netlist filed an action against SK hynix in the Western District of Texas, asserting that SK hynix infringed the '218 and '595 patents.  *Supra* ¶ 127.

156.    Netlist understood the '218 and '595 Notification-Signal Patents were invalid as it appeared to concede both were patentably indistinct from the '837 patent that the PTAB found invalid.  The Patent Office issued the '218 and '595 patents on January 2, 2018, and November 12, 2019, respectively.  During each patent's respective prosecution, the examiners

rejected all claims of the patent applications for double patenting as obvious over the '837 patent. The examiner concluded that there was no patentable distinction between the claims of both the '218 and '595 patents and their parent patent, the '837 patent.  Netlist filed a terminal disclaimer, appearing to concede that there is no patentable distinction between the claims in the '837, '218, and '595 patents.

157.    SK hynix also filed IPRs on the '218 and '595 patents.  IPR2020-01044, Paper No. 1; IPR2020-01042, Paper No. 1.  The PTAB instituted IPRs on all challenged claims of both the '218 and '595 patents on the grounds that SK hynix had "established a reasonable likelihood that it would prevail."  IPR2020-01044, Paper No. 13; IPR2020-01042, Paper No. 14. Those IPRs were dismissed in conjunction with Netlist's settlement of its litigation with SK hynix.

158.    Following the SK hynix settlement, Netlist asserted Notification-Signal Patents against Samsung knowing each was invalid.

159.    On October 15, 2020, Netlist sent Samsung a "Notice of Infringement," and accused Samsung of infringing the '218 and '595 Notification-Signal Patents for which the PTAB had instituted SK hynix's IPRs.

160.    **Delaware 1453 Notification-Signal Patent Litigation**: A year later, the day after the Central District of California summarily determined Samsung's license to Netlist was terminated, Samsung filed a declaratory judgment action against Netlist in the District of Delaware seeking a declaration that, *inter alia*, DDR4 LRDIMMs and RDIMMs, do not infringe the '218 and '595 patents.  Delaware -1453 Litigation, D.I. 1.  Netlist subsequently counterclaimed for infringement of both patents.  *Id.*, D.I. 40.

161.    The '218 and '595 patents met the same fate as the '837 and '623 Notification-Signal Patents.  The PTAB found all claims of the '218 patent unpatentable.  In a final

written decision on May 8, 2023, the PTAB found that each claim is unpatentable as obvious over the prior art references (a) Hazelzet and Buchmann or (b) Hazelzet, Buchmann, and Kim. IPR2022-00062, Paper 54.  Similarly, the next day the PTAB found each claim of the '595 patent unpatentable as obvious over the prior art references (a) Hazelzet and Buchmann or (b) Hazelzet, Buchmann, and Kim.  IPR2022-00064, Paper 54.  Thus, the same prior art that invalidated the '837, '218, and '623 patents also invalidated the '595 patent.  This is unsurprising as Netlist filed a terminal disclaimer during prosecution of the '218 and '595 patents, appearing to concede that there is no patentable distinction between the claims in the '837, '218, and '595 patents.

162.    Following the PTAB's final written decisions, Netlist agreed to dismiss its infringement counterclaims against Samsung in the Delaware -1453 Litigation related to the '218 and '595 patents.

163.    **Delaware 1122 and 614 Notification-Signal Patent Litigations**: As Netlist continued to prosecute additional patents in the Notification-Signal Patents family, Samsung filed declaratory judgment actions of non-infringement on these new patents as they issued.  Samsung first filed a declaratory action of non-infringement of the '024 patent . C.A. No. 23-1122-JLH, D.I. 1.  Netlist counterclaimed for infringement.  *Id.*, D.I. 26.  Samsung filed another declaratory judgment action of non-infringement of the '319 patent.  C.A. No. 24-614-JLH, D.I. 1.  Netlist also counterclaimed for infringement.  *Id.*, D.I. 33.

164.    Samsung also filed IPRs on both the '024 and '319 patents.  IPR2025-00001; IPR2025-00002.  The PTAB granted Samsung's petitions for both IPRs.  IPR2025-00001, Paper 17; IPR2025-00002, Paper 17.

165.    In granting institution of the IPR on the '024 patent, the PTAB noted that Netlist had filed a terminal disclaimer for the '024 patent over the '595 and '218 patents, IPR2025-

00001, Paper 17 at 19, which, according to the Board, "is a strong clue that a patent examiner, and, by concession, the applicant, thought the claims in the continuation lacked a patentable distinction over the parent," *id.* at 22. The PTAB ultimately concluded that "the differences between the claims in the '024 patent and the '623, '218, and '525 patents do not appear to materially alter the question of invalidity." *Id.*

166. In the institution decision on the '319 patent, the PTAB similarly found that the claims of the patent were patentably indistinct from the claims of the earlier-invalidated patents, concluding that "the differences between the claims in the '319 patent and the '623, '218, and '525 patents do not appear to materially alter the question of invalidity." IPR2025-0002, Paper 17 at 23.

167. The PTAB preliminarily found that the claims of the '024 and '319 patents were so similar to those already invalidated that collateral estoppel rendered the claims unpatentable. Specifically, the PTAB found Netlist was "collaterally estopped as to the challenges involved in the Petition, i.e., obviousness of claims 1–20 of the '319 patent." *Id.*

168. Netlist subsequently conceded that the '024 and '319 patents are invalid. On August 6, 2025, Netlist filed with the Patent Office disclaimers of claims 1–20 of the '024 patent and claims 1–20 of the '319 patent, disclaiming all claims of both patents. On August 7, 2024, Netlist filed a request for adverse judgment in each of the IPR proceedings.

169. The PTAB entered adverse judgments against Netlist in the IPR proceedings on September 8, 2025.

## VII. The Relevant Market

170. For purposes of Samsung's antitrust claims, the relevant markets are the markets for technologies covered by Netlist's patents issued in the United States that are essential, or are alleged or declared to be essential, to the JEDEC standards, including JEDEC Standard

No. 21-C, JESD79-4, and JESD82-31, and together with all other alternative technologies to these Netlist SEPs that could have been used in the JEDEC standards.  Throughout, these are referred to collectively as the "Relevant Markets."

171.    The patents themselves acknowledge the existence of alternatives to the allegedly claimed technologies.  For instance, while limiting the claims to notifying, the '024, '319, '218, and '595 patents state that "handshaking can be implemented in at least two ways; polling and notifying."  As another example, the '523 patent describes prior art advanced memory buffer technology ("AMB"): "In some cases such as where a memory module includes an AMB, the self-test logic (M[B]IST) implemented in the AMB includes command and address generation logic in addition to a data generator and checker.  Each of these functional blocks may be implemented on a single physical AMB device (e.g., a single integrated circuit package)."  On information and belief, had Netlist not deceived JEDEC about Netlist's patents and its intent to comply with its RAND commitments, JEDEC would have considered these and other alternative technologies.

172.    Had the alternative technologies been incorporated into the JEDEC standards, they would have been interchangeable with the technologies that Netlist alleges read on its alleged essential patents.  This is because each of the memory module manufacturers would have incorporated these alternative technologies into their JEDEC-compliant DIMM and HBM products.

173.    Once JEDEC adopts technology for a standard, the owner of each SEP used in that standard obtains monopoly power in the relevant technology market.  When patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology, and companies wanting to market devices that comply with the standard are

"locked in" and must use SEPs.  In other words, industry participants who have invested significant resources developing products and technologies that conform to the standard will find it prohibitively expensive to abandon their investment and switch to another technology, erecting a substantial barrier to innovation in alternative technologies or the use of any technology that does not comply with the standard.  Even if industry participants attempted to switch technologies, those alternative technologies would not comply with the standard and would not be commercially viable, as customers seek to purchase memory products that are interchangeable with other JEDEC-compliant memory modules and function within an integrated system.

174.    Netlist has submitted declarations that many of its patents are essential to the JEDEC standards, and made accompanying declarations to license those patents on RAND terms.  The markets encompassed within the Relevant Markets can thus be identified, in part, from Netlist's LOAs to JEDEC.

175.    Before the adoption of the JEDEC standards, competitors in the Relevant Markets included companies with technology capable of performing the same or equivalent functions that could have been adopted by JEDEC and its members.  Additional competitors include the companies that offered technologies that could have been used in alternate JEDEC standards that were foreclosed once JEDEC members adopted a standard that included Netlist's alleged SEPs.

176.    Because of the lock-in effect described above, once the JEDEC standards incorporated Netlist's alleged SEPs, Netlist became the only commercially viable and relevant seller inside the United States in each of the Relevant Markets.  In other words, there are now no reasonably interchangeable substitute technologies with Netlist's alleged SEPs for complying with these standards.

## VIII.  Netlist's Unlawful Acquisition of Monopoly Power

177.    The JEDEC standards effectively dictate what technology must be used and, by implication, also dictate that alternative technology will not be used.  Correspondingly, the opportunities to monetize memory technology that is not included in the JEDEC standards are limited in comparison to the opportunities to license the widely deployed technology specified within the JEDEC standards, and the holders of patents on memory technology that is not included in the JEDEC standards lack market power in attempting to license that technology.  Netlist participated in the development of JEDEC standards, and took actions to ensure that the JEDEC standards as written would be covered by Netlist's allegedly patented technologies.  Because Netlist does not make or sell its own products, the only way that it can monetize its claimed technology is through licensing, and it thus has a strong incentive to have its patented technology incorporated into the JEDEC standards.

178.    Netlist also has a powerful interest in appearing to obtain as many patents as possible that allegedly cover technologies adopted by the JEDEC standards, regardless of whether those patents are valid.  Having a large list of patents and patent applications to claim as essential to the JEDEC standards allows Netlist to put maximum pressure on prospective licensees—i.e., standard implementers—to extract maximum royalties for licensing its alleged SEPs in view of Netlist's refusal to license those patents on RAND terms.

179.    Netlist further had an opportunity to manipulate the standard-setting process and its own patent procurement efforts to serve its anticompetitive goals.  Netlist submitted declarations to JEDEC declaring that certain of its patents or patent applications may be or become essential to the JEDEC standards under consideration.  *See* Exs. 4–10 (Netlist LOAs).  Netlist also purported to commit to license any alleged SEPs it held on RAND terms, thereby implying that the cost to implementers of any license would be constrained and not increased due to the inclusion of Netlist's patented technology in the JEDEC standards.

180.    Netlist made these declarations to exclude alternative technologies and to ensure that the JEDEC standards incorporated Netlist's patented technologies such that any manufacturer of standard-complaint devices would need a license to Netlist's alleged SEPs.  In doing so, Netlist concealed its intent to engage in hold-up, to discriminate in the licensing of its alleged SEPs and demand unreasonable licensing terms without regard to the actual scope of Netlist's patent coverage, and to charge supra-competitive, unreasonable, and discriminatory royalty rates for its alleged SEPs.

<u>COUNT I</u>
**(Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)**

181.    Samsung restates and incorporates by reference the preceding paragraphs as if fully set forth herein.

182.    Netlist has market power in the Relevant Markets.  Netlist has asserted that it owns patents essential to practice the JEDEC standards required to manufacture standard-compliant DIMMs.  Netlist, therefore, by virtue of its alleged SEPs, is the sole supplier in that market, has excluded all competition, and has the power to charge supra-competitive prices.  The standard itself, set up to create interoperability of products and therefore competition for standard-compliant products, also creates significant barriers of entry into the Relevant Markets, allowing Netlist to acquire and maintain its monopoly power.

183.    Netlist acquired its monopoly power through improper and exploitative means.

184.    First, despite attending JEDEC meetings for years during the development of the relevant standards, Netlist failed to disclose its alleged SEPs related to those technologies until long after Netlist filed the patents and after the industry had committed to the standardized technology.  By the time of any of Netlist's relevant disclosures, the industry, including Samsung,

had expended significant resources in developing the standardized memory modules and was effectively locked into the standard.

185.    Second, Netlist eventually disclosed its patents to JEDEC committees as essential or potentially essential to DIMMs, and Netlist committed to JEDEC and the industry, by virtue of its long participation in JEDEC and eventual submission of LOAs to JEDEC committees, that it would license its essential patents on RAND terms and conditions.  In so doing, Netlist intentionally deceived JEDEC and the industry.  In fact, Netlist had no intention of abiding by its RAND commitments and subsequently demanded that the industry pay supra-RAND royalty rates to license technology that would allow the memory module manufacturers, including Samsung, to make and sell JEDEC-compliant products.

186.    JEDEC and its members relied on these intentional misrepresentations from Netlist.  JEDEC committees published the standards based on Netlist's representation that it would license its alleged SEPs on RAND terms and conditions, as JEDEC has a strong policy against the adoption of patented technologies for which the patent owner has not made a RAND commitment. The JEDEC Patent Policy states that, in the event of receipt of a Notice of Refusal, "JEDEC committees and task groups shall consider reasonable workarounds and technical alternatives." *Id*. § 8.2.2.2.  The policy further directs that if the JEDEC board has "a credible indication that the patent owner or applicant is unwilling or unable to grant licenses, with or without compensation, on RAND terms, then the Board *shall not* approve the issuance of the standard" without first "consider[ing] whether the committee used diligent efforts, if appropriate under the circumstances, to develop a standard that does not require the use of the Essential Patent Claim(s)" and adding to the standard "[a] special legal disclaimer."  *Id*. § 8.2.7 (emphasis original).  Thus, had JEDEC known of Netlist's intentions to seek supra-RAND royalties, the JEDEC committees would have

considered and adopted "reasonable workarounds and technical alternatives" to the technologies that Netlist alleges read on their patents.

187.    Netlist has leverage over manufacturers of standard-compliant products that it would not possess but for its false promises to license on RAND terms and its unlawful acquisition of monopoly power in the Relevant Markets.

188.    Third, Netlist used its membership in JEDEC committees to gather information about the technologies that would ultimately be incorporated into the JEDEC standards, file continuation applications on related patents and prosecute claims that allegedly read on the JEDEC standards, and then assert those purported SEPs against the industry.  For instance, even though there is no evidence that Netlist invented the full scope of the subject matter claimed in the '218 patent before JEDEC incorporated the technology into the JESD82-32 standard, Netlist drafted the '218 patent claims to be able to allege, in its view, that those claims read on that standard.  Netlist thereby acquired monopoly power for that technology and improperly gained and exploited that market power by demanding supra-RAND royalties for technologies that Netlist did not invent, thereby deceiving JEDEC and the industry and manipulating the Relevant Markets.

189.    Netlist has harmed competition in the Relevant Markets.    Netlist manipulated the standard-setting process by failing to disclose its alleged SEPs until the industry was locked into the standards and by making deceptive promises to JEDEC during the final adoption of the relevant JEDEC standards.  Netlist's deception also harmed competition by obscuring the costs of including its patented technologies in the standards, increasing the likelihood that its patent rights would be included and confer market power on Netlist.  Netlist's wrongful conduct in conjunction with the JEDEC standard setting process prevented Samsung from obtaining access to necessary technology in the Relevant Markets on RAND terms.

190.    Because of Netlist's unlawful monopolization, customers in the Relevant Markets, such as Samsung, face higher costs for access to DIMM technologies necessary for the manufacture of standard-compliant products than they would have paid in a competitive market.

191.    Further, as a consequence of Netlist's license of its patent portfolio to SK hynix ███████████ Samsung faces inherently discriminatory royalty demands for access to Netlist's alleged SEPs.    Netlist's license to SK hynix, coupled with Netlist's demands that Samsung pay a royalty ████████████████████ the amount of SK hynix's license, harms Samsung's ability to compete in the sale of DIMMs.    Thus, Samsung risks losing market share to competitors that do not pay Netlist's supra-RAND royalty rates, thereby distorting the overall DIMM market on account of Netlist's anticompetitive conduct.

192.    The antitrust injury associated with Netlist's unlawful monopolization of the Relevant Markets also extends to consumers in the downstream market for DIMMs, in the form of higher prices, reduced innovation, and more limited choice for such standard-compliant products.    The necessary result of raising costs to some competing manufacturers in the DIMM marketplace and diverting resources and monies that otherwise would have fueled additional innovation in memory module space has been to limit consumer choices.    Higher downstream prices also threaten additional harm in the form of the loss of customers and potential customers and the loss of product image and goodwill toward Samsung.

193.    Because of such leverage, manufacturers of standard-compliant products, including Samsung, must either capitulate to Netlist's supra-competitive licensing demands or face the costs and risks of protracted patent litigation.    The antitrust injury attributable to Netlist's overall anticompetitive scheme thus includes the litigation fees and costs necessary to avoid the

payment of supra-competitive licensing terms and exclusion from the marketplace for standard-compliant products.

<u>**COUNT II**</u>
**(Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)**

194.    Samsung restates and incorporates by reference the preceding paragraphs as if fully set forth herein.

195.    Netlist has intentionally attempted to acquire and exploit market power in the Relevant Markets related to JEDEC-compliant DIMMs.  Netlist has alleged that it owns patents essential to practice the JEDEC standards required to manufacture standard-compliant DIMMs. Netlist disclosed a number of its patents to JEDEC committees as essential to the standards under consideration and alleged in later litigation that those patents, or patents claiming priority to the disclosed patents, are standard essential.

196.    Netlist's misconduct at JEDEC has created a dangerous probability of achieving monopoly power.  Netlist has implicitly asserted to the industry that, by virtue of its patents that it alleges are essential to practicing the JEDEC standards, it is the sole supplier in the Relevant Market; Netlist has therefore attempted to exclude all competition, and it has the power to charge supra-competitive prices.  Netlist has therefore contended in negotiations and litigation that its patents are essential to manufacturing standard-compliant DIMM products, which creates significant barriers of entry into the Relevant Markets, allowing Netlist to acquire and maintain its alleged monopoly power.

197.    Netlist has attempted to acquire monopoly power through improper, exploitative means.  Netlist disclosed its patents to JEDEC committees as essential to DIMMs, committing to JEDEC and the industry that it would license those patents on RAND terms and conditions.  In so doing, Netlist intentionally deceived JEDEC and the industry.  Netlist had no

intention of abiding by its RAND commitments and subsequently demanded that the industry, and particularly Samsung, pay supra-RAND royalty rates to license technology that would allow the memory module manufacturers, including Samsung, to make and sell JEDEC-compliant products.

198.    On information and belief, Netlist knew that if it alleged that its patents were standard essential, Netlist would have leverage over manufacturers of standard-compliant products in the Relevant Markets that it would not possess but for its allegations of essentiality.

199.    Netlist also attempted to exploit its market power by using its membership in JEDEC committees to gather information about the technologies that would ultimately be incorporated into the standard, filing continuation applications on related patents and prosecuting claims that allegedly read on the standard, and then asserting those purported SEPs against the industry.  For instance, even though there is no evidence that Netlist invented the full scope of the subject matter claimed in the '218 patent before JEDEC incorporated the technology into the JESD82-32 standard, Netlist drafted the '218 patent claims to be able to allege, in its view, that those claims read on that standard.  Netlist thereby attempted to acquire monopoly power for that technology and improperly gained and exploited that market power by demanding supra-RAND royalties for technologies that Netlist did not invent, thereby deceiving JEDEC and the industry and manipulating the Relevant Markets.

200.    Because of Netlist's unlawful attempt at monopolization, customers in the Relevant Markets, such as Samsung, face a dangerous probability of a distorted market, including high costs and greater uncertainty with regard to their access to DIMM technologies necessary for the manufacture of standard-compliant products.  Samsung therefore faces additional harm in the form of lower market share and inability to recover market share, the loss of customers and potential customers, and the loss of product image and goodwill.

201.    The antitrust injury associated with Netlist's attempt to unlawfully monopolize the Relevant Markets also extends to consumers in the downstream market for DIMMs, in the form of higher prices, reduced innovation, and more limited choice for such standard-compliant products.    The necessary result of raising costs to some competing manufacturers in the DIMM marketplace and diverting resources and monies that otherwise would have fueled additional innovation in memory module space has been to limit consumer choices.

202.    Because of such leverage, even if the patents are not genuinely essential, manufacturers of standard-compliant products, including Samsung, must either capitulate to Netlist's supra-competitive licensing demands or face the costs and risks of protracted patent litigation.    The antitrust injury attributable to Netlist's overall attempted anticompetitive scheme thus includes the litigation fees and costs necessary to avoid the payment of supra-competitive licensing terms and exclusion from the marketplace for standard-compliant products.

<u>COUNT III</u>
**(Breach of Contract)**

203.    Samsung restates and incorporates by reference the preceding paragraphs as if fully set forth herein.

204.    Netlist has asserted that at least the '523, '218, '595, '623 and '837 patents are essential to one or more JEDEC standards.    These allegations of essentiality came in litigation against Samsung in the Delaware -1453 Litigation, in Netlist's litigation against SK hynix, and in Netlist's declarations to JEDEC.    *See Netlist, Inc. v. SK hynix Inc.*, No. 6:20-cv-00194 (W.D. Tex.), D.I. 1, ¶¶ 27, 37; *id.*, D.I. 1-5 ('218 Claim Chart for DDR4 LRDIMM); *id.*, D.I. 1-6 ('218 Claim Chart for DDR4 RDIMM); *id.*, D.I. 1-10 ('595 Claim Chart for DDR4 LRDIMM); *id.*, D.I. 1-11 ('595 Claim Chart for DDR4 RDIMM); *Netlist, Inc. v. SK hynix Inc.*, No. 8:16-cv-01605 (C.D.

59

Cal. Aug. 31, 2016), D.I. 1-13 ('837 Claim Chart for DDR4 RDIMM and LRDIMM).  The '024 and '319 patent claims are not patentably distinct from the '218, '595, '623 and '837 patent claims.

205.    Netlist also disclosed the parent patents of at least the '731, '608, '035, and '366 patents to JEDEC as essential to certain DDR4 JEDEC standards.  Netlist also alleged in previous litigation that the '608 and '035 patents are essential to certain JEDEC standards, and, in its ITC complaint against Samsung, Netlist reads the '087, '731, '608, '035, and '366 patents in a manner that those patents are essential to JEDEC DIMM and HBM standards if infringed.

206.    On information and belief, Netlist submitted LOAs to the JC-40, JC-42, and JC-45 committees in which Netlist promised to make available to implementers of the DDR4 Standards a license to the '837 patent "under reasonable terms and conditions that are demonstrably free of any unfair discrimination."  Ex. 4 ('837 LOA).  Under the JEDEC Patent Policy, those commitments extend to the claims of, among others, the '218, '595, '024, and '319 patents, to the extent they are essential to JEDEC standards.

207.    Netlist committed to license the '523 patent on RAND terms to implementers of certain JEDEC standards.  Upon information and belief, Netlist submitted a LOA for the '434 patent on April 7, 2016, related to JEDEC committee JC40 and DDR4 LRDIMM components.  Ex. 5 ('434 LOA).  The '523 patent is a continuation of the '434 patent.

208.    Netlist also committed to license the '608, '035, '731, and '366 patents on RAND terms to implementers of certain JEDEC standards.  Netlist disclosed U.S. Patent No. 9,128,632, the parent patent of both the '608 and '035 patents on April 7, 2016.  Ex. 6 ('632 LOA).  Netlist disclosed U.S. Patent No. 8,154,901, the parent patent of the '731 patent, in November 2010.  Exs. 7–8 ('901 LOAs).  Netlist disclosed U.S. Patent Nos. 8,301,833 and 8,874,831, the parent patents of the '366 patent.  Ex. 9 ('833 LOA); Ex. 10 ('831 LOA).

209.    Under the JEDEC Patent Policy, Netlist has a contractual commitment to grant implementers of the JEDEC standards, including Samsung, licenses on RAND terms and conditions.  This commitment applies to any SEP that Netlist disclosed to JEDEC, any SEP that claims priority to a patent that Netlist disclosed to JEDEC, and any other SEP that Netlist filed or was issued while Netlist was a member of JEDEC.  This also includes any patents that Netlist now denies are essential but are, under Netlist's infringement contentions, essential to certain JEDEC standards based on Netlist infringement read.

210.    Netlist licenses its SEPs to others on a portfolio-wide basis, i.e., it licenses all its patents, whether declared SEPs or not, together.  As such, Netlist has an obligation to provide a RAND offer to Netlist's SEPs that includes patents and patent applications that Netlist has declared essential to JEDEC and its undeclared patents and patent applications.  Anything short of such an offer would violate Netlist's RAND obligation

211.    Netlist contractual commitment also requires that it negotiate in good faith.  These contractual commitments are ongoing.

212.    Samsung is a willing licensee.  For example, Samsung entered into the JDLA in which Samsung licensed Netlist's patents.  Samsung has also engaged in good-faith negotiations since Netlist began its litigation campaign against Samsung.  For instance, on July 1, 2022, Samsung responded to Netlist's supra-RAND royalty demand by reiterating that "Samsung is willing to license any essential Netlist patents on actual RAND terms" and presenting a RAND counteroffer.  Samsung reiterated in its February 23, 2023 letter that "Samsung remains steadfast in its willingness to secure a reasonable and non-discriminatory ('RAND') license for Netlist's alleged standard essential patents."

213.    The JEDEC Patent Policy and/or Letters of Assurance constitute a valid and binding contract between Netlist and JEDEC.

214.    Samsung is a third-party beneficiary to the JEDEC Patent Policy and/or Letters of Assurance, and to Netlist's RAND obligations thereunder.  Participation in JEDEC committees and the standard-setting process is expressly conditioned on a commitment to license essential patents to third-party implementers on RAND terms.  Ex. 1 (JEDEC Manual No. 21T) § 8.2.2.1.  The JEDEC Patent Policy is therefore intended to benefit third-party implementers of JEDEC standards, such as Samsung, and the obligations under the JEDEC Patent Policy, including the RAND obligations, are intended to be enforceable by third-party implementers of the JEDEC standards.  Third-party implementers, such as Samsung, are also the only parties who could recover for Netlist's breach of its obligations under the JEDEC Patent Policy.

215.    Samsung, a long-time JEDEC member, has relied on the JEDEC Patent Policy and LOAs, including the RAND obligations set forth therein, in designing, manufacturing, and selling standard-compliant products, including the Samsung DIMM and HBM products, and Samsung has supported the JEDEC standard based on its understanding and expectation that JEDEC members, including Netlist, will abide by their obligations.

216.    Although Netlist accepted the benefits of its membership in JEDEC, Netlist has failed to fulfill its corresponding contractual commitments.  In particular, since the date of Netlist's purported termination of the JDLA to the present, Netlist has failed to negotiate in good faith or offer Samsung a license to patents that Netlist alleges are essential to the JEDEC Standards, on RAND terms and conditions.  The licensing demands Netlist has made of Samsung, including between July 2022 and June 2023, violate Netlist's RAND commitment.

217.    Netlist has demanded that Samsung enter a second license to patents that Samsung previously licensed from Netlist, specifically demanding that Samsung take an LRDIMM-only license for an amount that is orders of magnitude larger than the amount the parties agreed to in 2015 before Netlist had the leverage to hold up the industry.

218.    Netlist has demanded that Samsung enter a license that is orders of magnitude higher than Netlist's license with SK hynix, Samsung's competitor. Indeed, based on publicly available information, Netlist's royalty demand exceeded the royalty Netlist agreed to with SK hynix ███████████████████.

219.    Moreover, Netlist filed a complaint at the ITC on a number of patents that Netlist has alleged are standard essential or that claim priority to such allegedly standard essential patents. In so doing, Netlist has sought an exclusion order for Samsung products without negotiating in good faith for a RAND license to Netlist's patent portfolio.

220.    As a result of Netlist's breaches of contract, Samsung has been injured in its business or property because it has been denied access to a license to Netlist's alleged SEPs on RAND terms. Netlist's conduct threatens Samsung with imminent loss of customers and potential customers, loss of goodwill and product image, loss of sales, litigation costs, uncertainty in business planning, and uncertainty among customers and potential customers.

### COUNT IV
### (Unfair Competition Under Cal. Bus. & Prof. Code § 17200)

221.    Samsung restates and incorporates by reference the preceding paragraphs as if fully set forth herein.

222.    As described above and in this Count, Netlist has engaged in a pattern of fraudulent and unfair conduct, actionable in its entirety through the accumulation of a series of harms, that has injured Samsung and has had anticompetitive effects.

223.    By the acts alleged, Netlist has engaged in unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.* through conduct that violates the antitrust laws and other conduct.

224.    Netlist's conduct, as set forth in these counterclaims, constitutes: (a) unlawful business acts or practices in violation of the federal antitrust laws, (b) fraudulent conduct, and (c) unfair business acts or practices, including but not limited to unfair business practices threatening an incipient violation of an antitrust law, violating the policy or spirit of the antitrust laws, and otherwise significantly threatening and harming competition in California and elsewhere.

225.    Netlist committed unlawful business acts or practices by violating Section 2 of the Sherman Act.  *See supra* Counts I and II.

226.    Netlist engaged in unfair conduct in failing to disclose patents that are allegedly essential to certain JEDEC DIMM standards until the industry was locked in on the technology and engaged in fraudulent conduct by disclosing certain patents to JEDEC committees with no intention of abiding by its RAND commitments.  *See supra* ¶¶ 83–93.

227.    Netlist committed unfair business acts or practices by (a) failing to timely disclose its alleged SEPs, *supra* ¶¶ 68–93, (b) failing to disclose that it did not intend to meet its RAND commitments, *supra* ¶¶ 68–93, (c) obtaining its patents through improper derivation—claiming as its own the work of other JEDEC members, *supra* ¶¶ 94–123, (d) knowingly asserting invalid patents in litigation against Samsung, *supra* ¶¶ 154–169, (e) seeking injunctive relief against Samsung for its alleged infringement of Netlist's alleged SEPs, *supra* ¶ 219, and (f) breaching its commitment to license Netlist's alleged SEPs on RAND terms, *supra* ¶¶ 147–153.

228.    Netlist's pattern of fraudulent and unfair actions has a substantial nexus to California.  For example, Netlist employees, including Mr. Hyun Lee, attended JEDEC meetings in California and/or brought information from JEDEC meetings to California; Netlist directed and carried out prosecution of its alleged SEPs from California; Netlist sought to terminate Samsung's license to Netlist's patents in a California district court; Netlist's California-based employee issued a "Notice of Infringement" letter to, among others, Samsung's counsel in California; and Netlist's California-based employees made non-RAND licensing offers to Samsung.

229.    Netlist's pattern of conduct set out above, along with its outlandish, discriminatory royalty demands to Samsung, undermine competition, standardization and the very purpose of polices intended to protect competition in the collaborative standards setting process.

230.    Netlist's pattern of fraudulent and unfair conduct harms Samsung and is anticompetitive.  Samsung has suffered injury in fact and has lost, and continues to lose, money or property in excess of $75,000.

231.    The above-described ongoing course of unfair and/or fraudulent conduct by Netlist threatens an incipient violation of an antitrust law, and/or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, and/or it otherwise significantly threatens or harms competition.

232.    The above-described, ongoing course of unfair and/or fraudulent conduct by Netlist constitutes a continuing threat to Samsung.  Samsung is thus entitled to injunctive relief preventing Netlist from continuing its wrongful course of conduct.  Samsung is further entitled to additional relief including, without limitation, restitution from Netlist.

233.    Samsung has suffered and will continue suffer irreparable injury by reason of the acts, practices, and conduct of Netlist alleged above until and unless the Court enjoins such acts, practices, and conduct.

## COUNT V
### (Declaratory Judgment That Netlist Is Barred from Seeking and/or Enforcing an ITC Exclusion Order)

234.    Samsung restates and incorporates by reference the preceding paragraphs as if fully set forth herein.

235.    Netlist represented to JEDEC and has claimed in litigation that it owns patents that are essential or potentially essential to (i.e., would necessarily be infringed by complying with) JEDEC standards.  These patents, or patents that claim priority to them, include many of the patents asserted against Samsung in the ITC, including at least the '035, '608, '523, '731, and '366 patents.  In its ITC complaint against Samsung, Netlist also reads the '087, '731, '608, '035, and '366 patents in a manner such that those patents would be essential to JEDEC DIMM and HBM standards if infringed.

236.    Netlist has made a contractual commitment and/or is otherwise obligated by the JEDEC Patent Policy to grant implementers of JEDEC standards, including Samsung and its affiliates, licenses to its patents on RAND terms and conditions.

237.    Netlist licenses its alleged SEPs to others on a portfolio-wide basis, i.e., it licenses all its patents, whether declared SEPs or not, together.  As such, Netlist has an obligation to provide a RAND offer to Netlist's alleged SEPs that includes patents and patent applications that Netlist has declared essential to JEDEC and its undeclared patents and patent applications. Anything short of such an offer would violate Netlist's RAND obligation.

238.    Inherent in Netlist's RAND commitments is an admission that monetary compensation in the form of a RAND royalty is adequate to compensate Netlist for use of its patent portfolio.

239.    Samsung has expressed its willingness to take a license to Netlist's allegedly essential patents, including by entering into the JDLA, in which Samsung paid Netlist for a license to its entire patent portfolio. Further, at all relevant times, Samsung has negotiated with Netlist in good faith and has been willing to take a license to Netlist's allegedly essential patents on RAND terms and conditions, including by making a RAND offer for a license to Netlist's patents.

240.    There is a definite and concrete dispute between Samsung and Netlist regarding whether, alone or in combination with the negotiation history between the parties, Netlist's RAND obligations bar Netlist from seeking and/or enforcing injunctive relief against Samsung for its alleged infringement of Netlist's alleged standard-essential patents, including the patents Netlist has asserted against Samsung in the ITC.

241.    Netlist has in fact sought injunctive relief in the ITC against Samsung for alleged infringement of the '087, '035, '608, '523, '731, and '366 patents.

242.    As a result of the threat of injunctive relief, Samsung has been harmed and will continue to be harmed by the disruption of its business, imminent loss of profits, loss of customers and potential customers, loss of sales, loss of goodwill and product image, and litigation costs. If injunctive relief from this Court is not granted, Samsung will be irreparably harmed by the disruption of its business, loss of profits, loss of customers and loss of potential customers, loss of sales, and loss of goodwill and product image.

243.    Samsung is therefore entitled to a declaratory judgment that Netlist is barred by its RAND obligations from seeking and/or enforcing an ITC exclusion order against Samsung (including its affiliates) with respect to any alleged infringement of the '087, '035, '608, '523, '731, and '366 patents.

## JURY DEMAND

Samsung demands a jury trial on all issues and claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Samsung prays for judgment and relief as follows:

(a)    Enter a ruling that Netlist has violated Section 2 of the Sherman Act and an order enjoining Netlist from further violations of that statute;

(b)    Enter a ruling that Netlist's patents asserted against Samsung are unenforceable as a result of Netlist's scheme to acquire and exploit its monopoly power through enforcement of those patents;

(c)    Enter a ruling that Netlist violated California Business and Professions Code § 17200 based on its fraudulent and/or unfair conduct and an order enjoining Netlist from further violations of that law;

(d)    Enter a ruling that Netlist is liable for breach of contract for demanding unreasonable and discriminatory royalties for a license to Netlist's alleged standard-essential patents;

(e)    Enjoin Netlist from further demanding excessive, non-RAND royalties from Samsung;

(f)    Order that Netlist offer Samsung a RAND license to Netlist's alleged standard-essential patents;

(g)   Declare that Netlist may not seek or enforce any exclusion order or injunction against Samsung's JEDEC-compliant DIMM and HBM products for alleged infringement of any patents that Netlist must license on RAND terms and conditions;

(h)   Award Samsung restitution for the harm suffered as a result of Netlist's unfair competition and breach of contract;

(i)   Award Samsung treble damages for damages caused by Netlist's violation of Section 2 of the Sherman Act;

(j)   Award Samsung all damages caused by Netlist's breach of contract;

(k)   Award Samsung pre-judgment and post-judgment interest;

(l)   Award Samsung its costs and attorneys' fees in connection with this action; and

(m)   Award such further and additional relief, including additional equitable and injunctive relief, as the Court deems just and proper.

<table>
<tr><td>

OF COUNSEL:

Brian Nester
Peter Swanson
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC  20001-4956
(202) 662-6000

Thomas E. Garten
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000

December 31, 2025

</td><td>

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*
_____
Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Counterclaim-Plaintiff*

</td></tr>
</table>